**24-1917**
**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

AHMED ELZEIN

Plaintiff-Appellant,

v.

ASCENSION GENESYS HOSPITAL

Defendant-Appellee

**On Appeal from the United States District Court**
**For the Eastern District of Michigan**
**Southern Division**

**BRIEF ON APPEAL OF PLAINTIFF-APPELLANT**

**PROOF OF SERVICE**

**STEMPIEN LAW, PLLC**
**ERIC STEMPIEN (P58703)**
**Attorney for Plaintiff-Appellant**
**38701 Seven Mile Rd., Suite 445**
**Livonia, MI 48152**
**(734) 744-7002**

# TABLE OF CONTENTS

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION.....5

STATEMENT OF ISSUES FOR REVIEW ................................................6

SUMMARY OF ARGUMEN.....................................................................8

STATEMENT OF FACTS ........................................................................10

   I.  Factual Predicate.............................................................................10

   II.  Procedural Posture .........................................................................21

STANDARD OF REVIEW ......................................................................22

LAW AND ARGUMENT ........................................................................24

   I.  Defendant must Accept Plaintiff's Version of Events Unless Contradicted by the Record ...................................................................24

     A.  Plaintiff has Established a Claim for Disability Discrimination.................25

     B.  Plaintiff is Disabled .................................................................26

     C.  Plaintiff was Qualified for the Position.......................................26

     D.  Plaintiff Suffered an Adverse Employment Action .....................27

     E.  The Adverse Employment Action was Taken because of his Perceived Disability ..............................................................27

     F.  Defendant's Expressed Reasons for Non-Renewal of Plaintiff's Employment are Pretextual ....................................28

     A.  Plaintiff Exhausted his Administrative Remedies as to his Harassment based on National Origin Claim....................................34

     B.  The Harassment was Severe or Pervasive.................................35

   III.  PLAINTIFF HAS ESTABLISHED A VIABLE CLAIM FOR RETALITATION ................................................................36

   **IV.  PLAINTIFF HAS ESTABLISHED A CLAIM FOR FALSE IMPRISONMENT**................................................................37

CONCLUSION AND RELIEF REQUESTED .........................................41

DESIGNATION OF APPENDIX CONTENTS OF PLAINTIFF-APPELLANT..41

CERTIFICATE OF COMPLIANCE........................................................43

**CERTIFICATE OF SERVICE** ...........................................................44

# TABLE OF AUTHORITIES

## Cases

*Ajax Paving Indus, Inc v Vandenbosch Constr Co.*, 289 Mich. App. 639, 797 N.W. 2d 704 (2010)...............................................................................................29

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986)..................................... 23, 30

*Brenneman v. MedCentral Health System,* 366 F.3d 412 (6th Cir. 2004)...............25

*Celotex v. Catrett*, 477 U.S. 317 (1986) ....................................................................22

*Chapman v. UAW Local 1005*, 670 F.3d 677 (6th Cir. 2012) .................................23

*Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995) .................................................23

*Demyanovich v Cadon Plating LLC*, 747 F.3d 419 (6th Cir 2014)..........................25

*Dillon v. DeNooyer Chevrolet Geo*, 217 Mich. App. 163, 550 N.W. 2d 846 (1996) ....................................................................................................................................29

*Donald v. Sybra*, 667 F.3d 757 (6th Cir 2011) ........................................................36

*Jones v. Byrnes*, 585 F.3d 971 (6th Cir. 2009) ........................................................22

*Klapp v United Ins. Grp Agency, Inc.*, 468 Mich. 459; 663 N.W. 2d 447 (2003)...30

*Matsushita Elec. Ind. v. Zenith Radio Corp*. 475 U.S. 574 (1986) .........................22

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) .............................. 27, 36

*Meritor Sav Bank, FSB v. Vinson*, 477 U.S. 57 (1986) ...........................................34

*Packard v. Farmers Ins. Co. of Columbus Inc.*, 423 F. App'x 580 (6th Cir. 2011)37

*People v. Jaffray*, 445 Mich. 287; 519 N.W.2d 108 (1994) ....................................40

*Scott v. Haris*, 550 U.S. 372 (2007)...................................................... 16, 17, 24, 42

*Williams v CSX Transp Co*, 643 F3d 502 (6th Cir 2011) ........................................34

*Williams v. General Motors Corp.*, 187 F.3d 553 (6th Cir. 1999) ..........................35

## Statutes

28 U.S.C. § 1291 .........................................................................................................5

28 U.S.C. § 1331 ................................................................................4

42 U.S.C. § 1983 ................................................................................5

MCL 330.1437 .................................................................................39

MCL 330.1438 .................................................................................39

Title VII of the Civil Rights Act of 1964................................. 5, 21, 33, 34

## Other Authorities

M Civ JI 116.02 ...............................................................................37

M Civ JI 116.21 ...............................................................................37

## Rules

Rule 30(b)........................................................................................41

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

Jurisdiction belonged to the United States District Court for the Eastern District of Michigan pursuant to 28 U.S.C. § 1331 as pertains to the federal question posed by Plaintiff's causes of action comprising a violation of Title VII of the Civil Rights Act of 1964 claim against the Defendant. Jurisdiction over the instant appeal of Order Granting the Defendants' Motion for Summary Judgment is conferred upon this Court by 28 U.S.C. § 1291 as an appealable final decision.

## STATEMENT OF ISSUES FOR REVIEW

I.   **WAS THE DEFENDANT ENTITLED TO SUMMARY JUDGMENT WHEN THE PLAINTIFF'S VERSION OF EVENTS MUST BE ACCEPTED AS TRUE, UNLESS BLATANTLY CONTRADICTED BY THE RECORD?**

Plaintiffs Answer: No
Defendant Responds: Yes

II.  **WAS THE DEFENDANT ENTITLED TO SUMMARY JUDGMENT WHEN PLAINTIFF ESTABLISHED AT THE VERY LEAST THAT DEFENDANT CONSIDERED HIM TO BE DISABLED BASED UPON ITS CONCLUSION THAT PLAINTIFF WAS SUFFERING FROM PARANOID DELUSIONS?**

Plaintiffs Answer: No
Defendant Responds: Yes

III. **WAS THE DEFENDANT ENTITLED TO SUMMARY JUDGMENT, WHEN PLAINTIFF RECEIVED NO LESS THAN TWO 'RETURN TO WORK' CLEARANCES AND WAS OTHERWISE QUALIFIED FOR HIS POSITION, BUT WAS NEVERTHELESS REMOVED FROM THE RESIDENCY PROGRAM BECAUSE OF A PERCIEVED DISABILITY?**

Plaintiffs Answer: No
Defendant Responds: Yes

IV.  **WAS THE DEFENDANT ENTITLED TO SUMMARY JUDGMENT, WHEN THE REASON ADVANCED FOR NOT RENEWING PLAINTIFF'S CONTRACT WERE PRETEXTUAL AND DEFENDANT INSISTED THAT PLAINTIFF COULD ONLY BE CLEARED BY ITS ONE CHOSEN PHYSICIAN?**

Plaintiffs Answer: No
Defendant Responds: Yes

**V.    WAS THE DEFENDANT ENTITLED TO SUMMARY JUDGMENT, WHEN THE HARASSMENT DESCRIBED BY PLAINTIFF WAS SEVERE AND/OR PERVASIVE?**

Plaintiffs Answer: No
Defendant Responds: Yes

## SUMMARY OF ARGUMENT

In this factually unique case, Plaintiff was a resident physician with Defendant Ascension Genesys Hospital who was summarily singled out after some innocuous events which were blown well out of proportion and who was fired for reasons other than that which the latter would admit to. E.g., where Plaintiff reported to hospital security that he had seen an unknown figure without a badge nevertheless breach the employee's lounge, place an unknown object in a locker and thereafter depart the premises, Defendant unaccountably claimed that Plaintiff asserted that the unknown object was a bomb. The goal was to paint Plaintiff as an erratic individual who posed a danger to the public, or at least to the Defendant and its clients. This set the stage for the series of events which ultimately culminated in the Defendant firing Plaintiff.

While Plaintiff had not been feeling well, he had been cleared to return to work by no less than two medical employees, one of whom was employed by the Defendant. Plaintiff was compelled to visit the emergency room and tarry there involuntarily after it was made clear to him in no uncertain terms that his permission was moot, and that he had no agency. In a series of actions that demonstrates a surfeit of bad faith or pretext, Defendants set about neutering the 'return to work' notes which had been issued to Plaintiff as an indication that he was physically and mentally cleared to resume his employment duties. Defendant's action in writing a physician and instructing him to retract a 'return to work' note that he had issued

8

Plaintiff, rejecting a second note without informing Plaintiff of the reason for doing so and insisting that Plaintiff could only be cleared to return to work by a doctor in its employ who had been compromised is evidence of Defendant's animus towards the Plaintiff. While Plaintiff was enduring these hassles with the leadership at the hospital, he was also enduring incidents of discrimination from his coworkers.

Examining a totality of the circumstances, it is clear that Plaintiff was discriminated against as a result of his race or national origin, and that the overall harassment situation at his job was severe and pervasive. Plaintiff was fired at least partially as a result of reporting instances of other employees disparaging him based on his race or national origin, or at least making statements based on race and national origin such as Plaintiff would find disturbing. These actions – and the Defendant's evident ratification of them by firing him – form the basis for the Plaintiff's varied claims. In setting fort its version of events, Defendant pointedly failed to accept Plaintiff's account as it must as the moving party behind a motion for summary judgment such as was brought down below, in the trial court.

For these reasons, the trial court's order granting summary judgment for Defendant merits reversal.

## STATEMENT OF FACTS

### I.  Factual Predicate

At the pertinent times, Dr. Elzein (also "Plaintiff") was a first-year physician resident in the internal medicine residency program at Ascension Genesys Hospital. He was born in Khartoum, Sudan, but moved to the United States with his family when he was only 11 years old. He is a United States citizen. **R.E. No. 26-2**, *Plaintiff's Deposition Transcript*, Page ID 343, filed 03/25/24. In 2009, he returned to Sudan to become acquainted with its culture and potentially to attend school. He was subsequently admitted to the University of Khartoum. There, he attended a seven year program, graduating in 2016 with a degree equivalent to a US medical doctor degree. **R.E. No. 26-2**, Page ID 344.

Dr. Elzein then returned to the United States. In the year 2020, he was accepted into the residency program at Ascension Genesys Hospital in Grand Blanc. On November 11, 2020, Dr. Elzein was in the residents' lounge when an unfamiliar figure entered the room. This person was not part of the residency program, nor was the person wearing a badge indicating any affiliation with the hospital and Dr. Elzein had never seen them before. That person then placed an unknown item into one of the lockers. Plaintiff thereafter contacted hospital security and told them what had occurred. Security responded with "thank you for informing us and we'll check it out". **R.E. No. 26-2**, Page ID 348-49.

. Hospital Security then looked in the lockers that were in the area that Dr. Elzein identified. They found a brown paper bag in one of the lockers, which was unlocked. **R.E. No. 26-3**, *Deposition of Tammy Gauthier*, Page ID 366, filed 03/25/24. When security determined that there was nothing suspicious or concerning, they cleared the lounge. **R.E. No. 26-3**, Page ID 367.

After security left the lounge, Dr. Elzein then continued to work patient notes on his computer. **R.E. No. 26-2**, Page ID 349-50. He was soon to be interrupted by fellow resident Dr. Natalia Baj. Dr. Baj came into the room where Dr. Elzein was working and asked him "why did you call security?" **R.E. No. 26-2**, Page ID 350. Plaintiff disclosed that he felt "uncomfortable" because someone who was "not one of our interns" nevertheless came into the intern room and put something in a locker, and that was why he contacted security. **R.E. No. 26-2**, Page ID 350. Dr. Baj then started asking Dr. Elzein "how are you doing overall". He responded that he was actually not feeling very comfortable, and he relayed to her that he had experienced some comments and communication from other residents over the past few months that had upset him.[1] In this conversation with Dr. Baj, Dr. Elzein did provide her with details about two incidents of harassment. **R.E. No. 26-2**, Page ID 350. Her response was "oh, wow", and then the conversation ended.

---

[1] These instances of racial harassment are further discussed *infra*.

11

Dr. Elzein returned to working on his patient notes. Dr. Baj returned sometime later and told Dr. Elzein that the program director, Dr. Barbara Pawlaczyk, wanted to speak with him. **R.E. No. 26-2**, Page ID 351. Thereafter, Dr. Pawlaczyk asked Plaintiff: "Ahmed, what's going on?" He responded by asserting "nothing", but also went on to describe to Dr. Pawlaczyk that he had been speaking with Dr. Baj about the harassment incidents that he described. **R.E. No. 26-2**, Page ID 352. Dr. Pawlaczyk then brought up an incident that had occurred the day before involving a patient who was psychotic and combative. In that incident, Dr. Elzein had expressed to a senior resident that he was uncomfortable seeing the patient alone because he had only just begun his residency and he did not have "the ability to handle such a complex case." He asked the senior resident to take the lead, which he did. **R.E. No. 26-2**, Page ID 352. The third-year resident went into the patient's room and Dr. Elzein followed. Dr. Elzein stayed in the room only as an observer. *Id*. For some reason, this upset Dr. Pawlaczyk whom Dr. Elzein described as "kind of angry" about this incident. **R.E. No. 26-2**, Page ID 353. Following that interaction, she asked him "why did you call security?" which Dr. Elzein perceived to be accusatory. *Id*. She then tells him that he should take the next day off work. **R.E. No. 26-2**, Page ID 354. She also said that she wants him to talk to the psychologist at the hospital. He then received a text from Dr. Kirkpatrick, a psychologist at Ascension. *Id*.

12

In that text, she indicated that Dr. Pawlaczyk had asked her to reach out to him and that she would call him. Plaintiff agreed to speak with her. **R.E. No. 26-2**, Page ID 354. At this point, Dr. Elzein was "just trying to process everything" because he had come in with "a complaint of racial harassment" and was now "being portrayed as psychotic or psychologically abnormal". He then went to his vehicle for a "breath of fresh air" and to process what was going on. **R.E. No. 26-2**, Page ID 354. Two residents approached his car and asked him to come inside with them to get something to eat. When he was in line in the cafeteria, Dr. Pawlaczyk and Dr. Baj arrived at the cafeteria. They took him over to a table and sat down with them. **R.E. No. 26-2**, Page ID 355. Dr. Pawlaczyk told him "I don't think you're thinking right." He asked her why she would think that. She responded "because of the fact that you called security." He told her that he was uncomfortable because of the person who came into the lounge. She kept insisting "no, I think you – you're not thinking right." **R.E. No. 26-2**, Page ID 357.

At that juncture, Dr. Pawlaczyk told Dr. Elzein that she needed him to visit the emergency room in order to be examined. Plaintiff responded that he was "completely fine". He explained that "this is my first day opening up to you guys" about the harassment and that it is "emotional." **R.E. No. 26-2**, Page ID 358. He then insisted that if she were to insist that he go to the emergency room that he would need to have a psychologist see him. Dr. Pawlaczyk then contacted Dr. Mark Vogel,

another psychologist at Ascension. She asked Dr. Vogel to "come down and see if I [Dr. Vogel] could convince him [Dr. Elzein] to go to the Emergency Room . . ." **R.E. No. 26-4**, *Mark Vogel's Deposition Transcript*, Page ID 370, filed 03/25/24.

Dr. Elzein then asked if he could make a phone call. He contacted several attorneys until he is able to reach one. At the conclusion of his phone call with the attorney, he divulged to Dr. Pawlaczyk that he did not wish to go to the ER. At this point, Plaintiff was crying due to the stress of the situation. **R.E. No. 26-2**, Page ID 360. When he declined to go to the ER this time, Dr. Pawlaczyk called Dr. Vosburgh, who is a physician in Ascension's associate health department. Dr. Vosburgh told her "to take Dr. Elzein to the emergency room", even though Plaintiff had said that he would not go. Dr. Vosburgh told Dr. Pawlaczyk to call security to force Dr. Elzein to the emergency room. **R.E. No. 26-5**, *Deposition Transcript of Dr. Pawlaczyk*, Page ID 373, filed 03/25/24.

Dr. Pawlaczyk did in fact contact security thereafter. **R.E. No. 26-5,** Page ID 374. In response, two security guards came to the cafeteria and placed a wheelchair right next to Dr. Elzein and asked "is he not complying?" **R.E. No. 26-2**, Page ID 360. Plaintiff testified that this "was a very traumatic experience, but I'm not sure, after that, what happened. I felt very scared". **R.E. No. 26-2**, Page ID 360. Dr. Elzein then agreed that he would walk to the emergency room. He was escorted there by Dr. Pawlaczyk, Dr. Baj and one of the security officers. **R.E. No. 26-2**, Page ID 361.

In the emergency room, Dr. Bradley Caloia was the attending physician. Dr. Pawlaczyk spoke with Dr. Caloia. **R.E. No. 26-6**, *Dr. Caloia's Deposition Transcript*, Page ID 378, filed 03/25/24. She told him that Dr. Elzein was delusional "including accusing a workmate of placing a bomb in a locker and accusing a fellow of placing a 'toxic dangerous item' in his pocket." **R.E. No. 26-7**, *Clinical Certificate*, Page ID 383, ¶ 7, filed 03/25/24. The entire basis for Dr. Caloia's conclusion in recommending involuntary commitment was based on information that he had derived from Dr. Pawlaczyk and Dr. Baj. No information contained in the Clinical Certificate came from Dr. Elzein, only from the other two individuals. **R.E. No. 26-7**, Page ID 383, ¶ 7. In fact, during his deposition, Dr. Caloia reviewed his entire chart and could find no indication that these alleged "delusions" came from Dr. Elzein or anyone else besides Dr. Pawlaczyk and Dr. Baj. **R.E. No. 26-6**, Page ID 379.

Whist he was in the emergency room, Plaintiff was not free to leave. He was ordered to give over his mobile phone, which had the immediate effect of cutting him off from contact with the outside world. More disturbingly, the ER personnel told him that he was going to be put in restraints and have his clothes cut off him. (Videos from ER on 11/11/2020).[2] In his treatment summary, Dr. Caloia stated that

---

[2] This constituted Plaintiff's Exhibit 15 down below, and was submitted to the trial court in the traditional manner.

Dr. Pawlaczyk informed him that not only did Dr. Elzein have paranoid delusions about "bombs" and having something placed in his pocket, but that he was also "having delusions of persecution." **R.E. No. 26-8**, *CCDA[3] Provider Discharge Summary*, Page ID 387-389, filed 03/25/24. A reasonable inference from this statement is that Dr. Pawlaczyk was referring to his complaints about harassment, as this appears to be a separate item from the other issues that she raised.

Dr. Caloia sought a consult from Kathleen Scott (f/k/a Hadden) a social worker at Ascension. Ms. Scott conducted a psychosocial assessment in the emergency room. The assessment showed that: 1) Dr. Elzein denied ever saying that there was a bomb[4] in the locker; 2) Dr. Elzen denied experiencing any hallucinations, paranoid ideation, feelings that others are targeting him or trying to harm him; 3) He reported that he was feeling tired; 4) Under "Concern for delusional ideation and paranoid ideation," Ms. Scott wrote "Absent," and; 5) His countenance was "composed", his motor activity was "appropriate" and he was "cooperative during assessment." **R.E. No. 26-8.**

---

[3] From research, 'CCDA' means Consolidated Clinical Document Architecture which is a standardized format for exchanging patient health information between different system and providers in order to ensure consistent and accurate data sharing.

[4] Defendant's Motion for Summary Judgment Claimed that Plaintiff had asserted that the unknown figure had placed a bomb in the lockers.

Despite these findings, Ms. Scott completed a Petition for Mental Health Treatment in order to have Dr. Elzein involuntarily committed to a psychiatric facility. **R.E. No. 26-7**. That Petition relies on statements told to her by Dr. Caloia that had been relayed by Dr. Pawlaczyk. **R.E. No. 26-7**, Page ID 381, ¶ 4(b). The emergency room treatment, the involuntary commitment, and the subsequent hospitalization was not based on Dr. Caloia or Ms. Scott having heard these alleged "delusions" from Dr. Elzein, but only from Dr. Pawlaczyk and Dr. Baj. *See* **R.E. No. 26-6**, Page ID 379. and **R.E 26-7.** Each of these exhibits show that the entire basis for locking Plaintiff up in a psychiatric facility was based on what they were told.

Defendant then transferred Plaintiff to a psychiatric facility. **Exhibit 8**, last page and (**Exhibit 9**, Deposition of Kathleen Scott, p. 47).[5] He was taken to Havenwyck Hospital where he was held involuntarily for six days. (**Exhibit 11**, Havenwyck Records). Despite having taken away his liberty against his will, and the detailed legal process that is required of it when locking up a citizen for alleged mental health reasons, Defendant never filed the Petition for Mental Health Treatment with any probate court. **R.E. No. 26-10**, *Deposition Transcript of*

---

[5] Sdd its Brief, Defendant twice states that it only became aware that Dr. Elzein had been admitted to a psychiatric facility during the discovery stage of this litigation. *See pages 9 and 16 of Defendant's Brief, ECF No. 25, Page ID.160 and 167* This is patently false. It was Defendant who involuntarily committed him to a psychiatric facility. *See* **Exhibits 6, 8 and 9**. Further, on November 12, 2020, Dr. Pawlaczyk sent an email to Dr. Vosburgh stating that Dr. Elzein had been escorted to the emergency room the day before and then "was admitted to a psychiatric hospital"..

*Kathleen Scott*, Page ID 398, filed 03/25/24. Discovery in this case revealed that there was never any petition filed in any probate court for Dr. Elzein's involuntary commitment by Defendant.

At Havenwyck, it is again clear that the basis for this alleged paranoid delusions comes only from the statements by Dr. Pawlaczyk and Dr. Baj, passed through Dr. Caloia (on the Clinical Certificate) to Havenwyck. In the initial intake, the intake person at Havenwyck only relied on the Clinical Certificate for the justification for hospitalization, which of course contained only Dr. Caloia's statement as to what Dr. Pawlaczyk said to him. **R.E. No. 26-12**, *Havenwyck Hospital Records*, Page ID 402-413, filed 3/25/24. Dr. Elzein told Havenwyck that "I do not know why I'm here." The initial psychiatric visit was conducted on November 12, 2020 at 10:50 a.m. The patient history states that "it was reported that he was acting bizarre (sic)." *Id*. After six days in the hospital, without any access to the outside world, or to the courts for that matter, Dr. Elzein was finally released. **R.E. No. 26-13**, *Return to Work with No Restrictions Certification*, Page ID 415, filed 03/25/24. Havenwyck provided a return to work note indicating that he could resume his duties "with no restrictions." *Id*.

On the day of his return to work, November 23, 2020, Dr. Elzein visited the occupational health physician at Ascension, Dr. Tajour. He presented Dr. Tajour the Havenwyck return to work note. **R.E. No. 26-2**, Page ID 362. He told Dr. Tajour

that he had been stressed out at work, that he had a runny nose, was generally not feeling well, had been sent to the emergency room and had been in the hospital and then released. **R.E. No. 26-14**, *(Interview Notes with Plaintiff), Confidential – Subject to Protective Order*, Page ID 417-418, filed 03/25/14. Defendant's HR representative notes of interview Dr. Tajour then cleared Dr. Elzein to return to work as of November 23, 2020. **R.E. No. 26-15**, *Medical Status Report – Ascension Genesys Hospital*, Page ID 420, filed 03/25/24. A few days later, Defendant took steps to revoke the return to work certificate issued by Dr. Tajour. Shakun Pacer, a Regional Manager for Defendant Ascension, wrote an email to Dr. Tajour instructing him to "retract his RTW [return to work]." The sole basis for her instruction was that Dr. Elzein was not willing to go see Dr. Vosburgh. **R.E. No. 26-16**, *Email from Shakun Pacer to Burhan Tajour, Confidential – Subject to Protective Order*, Page ID 422-426, filed 03/25/24. Dr. Tajour then called Dr. Elzein and told him that he was revoking the clearance. **R.E. No. 26-2**, Page ID 363.

Despite Plaintiff now having two return to work notes, Defendant continued to refuse to allow him to return. Defendant's human resources testified that this was because Defendant would only accept a return to work note from the head of its Occupational Health Department, Dr. Vosburgh. **R.E. No. 26-17**, *Marney Daugherty's Deposition Transcript*, Page ID 429, filed 03/25/24. Dr. Elzein expressed to Ms. Daugherty concern about being required to see Dr. Vosburgh

19

because he had Plaintiff's entire work history, including alleged performance deficiencies and because Dr. Vosburgh made him feel uncomfortable. **R.E. No. 26-17**, Page ID 430. On December 1, 2020, Dr. Elzein wrote to Ms. Daugherty and told her that while he had concerns about Dr. Vosburgh being biased towards him, he would be willing to see any other occupational health physician of Ascension's choosing, "be it within the State of Michigan or anywhere in the US, even at my own expense." **R.E. No. 26-18**, *Email from Plaintiff to Daugherty – Confidential, Subject to Protective Order*, Page ID 432-433, filed 03/25/24. Defendant refused his offer and instead continued to insist that the only return to work that would be accepted would be from Dr. Vosburgh. **R.E. No. 26-19**, *12/4/2020 and 12/9/2020 emails from Daugherty to Elzein*, Page ID 435-436, filed 03/25/24. **R.E. 26-17**, Page ID 429. When that issue was not resolved, Defendant placed Plaintiff on involuntary leave and later removed him from the residency program. *See* **R.E. 25-12**, Page ID. 238.[6]

In addition to the issues surrounding the perceived disability and return to work, throughout the fall of 2020, Dr. Elzein suffered a hostile work environment based on his race and national origin: He was the only non-white resident in the 2020 residency class. **R.E. No. 26-2**, Page ID 346. The other residents in his class would mock the names of African-American patients who had non-traditional names such as "Lakquisha" or "Britiana". He would tell them that this was "not cool." **R.E. No.**

---

[6] Also Defendant's Exhibit 11 down below, in the trial court.

**26-2**, Page ID 345. Eventually, his supervisor, Dr. Barbara Pawlaczyk, told him that the other residents were "feeling uncomfortable" around him and that he just needed to "fit along" with his co-workers. **R.E. No. 26-2**, Page ID 345. Another resident, Brandon Wiggins stated that he was going to send a sputum culture (which is a culture taken from a patient's nasal discharge) for analysis. He then compared the sputum culture to "black culture". **R.E. No. 26-2**, Page ID 347. A white resident, when talking about some neck pain, said "my n----er hurts", instead of "my neck hurts." **R.E. No. 26-2**, Page ID 350. Another incident occurred when Plaintiff was praying at the hospital, and another resident sat down next to him and said "why don't you go back to where you came from." **R.E. No. 26-2**, Page ID 350.

## II.    Procedural Posture

The Plaintiff Ahmed Elzein filed a Charge of Discrimination against Defendant Ascension Genesys Hospital with the Michigan Department of Civil Rights, to be passed to the EEOC on May 12, 2021. **R.E. No. 31**, *Trial Court Opinion and Order, Page ID 611*, filed 9/25/24. The EEOC subsequently issued a 'Notice of Your Right to Sue' to the Plaintiff on July 13, 2022. **R.E. No. 31**, Page ID 61). Plaintiff then file his Complaint at the Eastern District Court for the Eastern District of Michigan, Southern Division on October 4, 2022. **R.E. No. 1**, *Plaintiff's Complaint*, filed 10/4/2022. The Complaint leveled five counts against Defendant Ascension Genesys Hospital to wit: 1) A disability discrimination under the ADA;

21

(2) A race and national origin-based harassment under Title VII; (3) A religious harassment under Title VII; (4) A retaliation under Title VII; and (5) a state law claim for false imprisonment. **R.E. No. 1.**

At the heels of discovery, Defendant filed its Motion for Summary Judgment on February 29, 2024. **R.E. No. 25**, *Defendant's Motion for Summary Judgment*, Page ID 146-176, filed 02/29/24. The Plaintiff filed his Response to the Motion for Summary Judgment on March 25, 2024 **R.E. No. 26**, *Plaintiff's Response to the Defendant's Motion for Summary Judgment*, Page ID 306-338, filed 03/25/24. This last brief elicited a Reply from Defendant. **R.E. No. 29**, Defendant's Reply Brief in Support of its Motion for Summary Judgment, Page ID 476-485, filed 04/05/24. The trial court issued its opinion and order granting summary judgment on behalf of the Defendant on August 25, 2024. **R.E**. No. 31. The instant appeal followed.

## STANDARD OF REVIEW

Summary judgment is properly granted where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Jones v. Byrnes*, 585 F.3d 971 (6th Cir. 2009). Where a reasonable jury may return a verdict for the party opposing the summary judgment, such an entry is not warranted. *Id*. To avoid summary judgment, the opposing party must elicit enough

evidence on the record as would permit a reasonable jury to find for it at trial. *Matsushita Elec. Ind. v. Zenith Radio Corp*. 475 U.S. 574 (1986).

Where reasonable minds may differ as to the significance of the evidence, a verdict should not be directed. *Id*. The moving party retains the burden of showing an absence of evidence to support the non-moving party's case. *Celotex v. Catrett*, 477 U.S. 317 (1986). It is only once the moving party has met this threshold burden that the nonmoving party shoulders the burden to adduce "significant probative evidence tending to support the complaint." *Copeland v. Machulis*, 57 F.3d 476, 478-79 (6th Cir. 1995) citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The court must consider the evidence in the light most favorable to the non-moving party but may juxtapose competing inferences. *Matushita*, 475 U.S. at 574.

The relevant inquiry becomes whether the evidence presents enough of a disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Anderson*, 477 U.S. at 248. The elicited facts and any inferences that may be drawn therefrom are to be drawn in the light most favorable to the non-moving party. *Chapman v. UAW Local 1005*, 670 F.3d 677, 680 (6th Cir. 2012).

## LAW AND ARGUMENT

### I.    Defendant must Accept Plaintiff's Version of Events Unless Contradicted by the Record

As a preliminary matter, Defendant Ascension Genesys Hospital failed to accept Plaintiff's version of events as it is bound to, as the moving party in a motion for summary judgment, unless Plaintiff's version is contradicted by the record. There is a divergence in the account of events rendered by Plaintiff on the one hand, and Defendant on the other hand, on the fateful day which spurred on the underlying events: November 11, 2020. For example, Plaintiff is firm that he never relayed to anyone that the unknown figure who had entered the lounge had left a bomb in the locker; he had merely stated that an unknown individual had placed an equally unknown substance or material in the locker. The trial court documented some of this variance in the parties' accounts, stating that:

> *Ascension has a different account of those events*. According to Ascension, on November 11, 2020, Residents reported to Dr. Pawlaczyk that Dr. Elzein was acting strange and that they were concerned about his well-being. ECF No. 25, PageID.158. They allege that Dr. Elzein had expressed discomfort in seeing a particular patient because he was "convinced" that the patient was violent, even though the patient was sleeping. *Id*. at PageID.157. Dr. Elzein was witnessed sitting in an on-call room staring at his computer screen blankly for hours. *Id*. Dr. Elzein also sat with his back to the wall in the lounge, recording his colleagues with a cell phone, claiming that many strange things were happening that needed to be recorded. *Id*. at PageID.158. He claimed that a fellow Resident placed a harmful talisman in his pocket (which he could not produce). *Id*. Because the other Residents were concerned about his ability to go home alone, Dr. Pawlaczyk arranged to see Dr. Elzein. *Id*.

24

**R.E. No. 31**, Page ID 607 (emphasis added).

Precedents are clear that Defendant must accept Plaintiff's version of events for purposes of a motion for summary judgment, save where said rendition of events is explicitly disputed by the record. *Scott v. Haris*, 550 U.S. 372 (2007) stands for the proposition that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id*.

### A. Plaintiff has Established a Claim for Disability Discrimination

Plaintiff's first count is disability discrimination in violation of the Americans with Disabilities Act (ADA). To state a prima facie case of disability discrimination under the ADA using circumstantial or indirect evidence, a plaintiff must establish the following elements: (1) the person is a disabled person within the meaning of the ADA, (2) the person is otherwise qualified for the position with or without a reasonable accommodation, (3) the person suffered an adverse employment decision, and (4) the adverse employment decision was made because of the person's disability. *Demyanovich v Cadon Plating LLC*, 747 F.3d 419, 433 (6th Cir 2014).

Once a plaintiff establishes a *prima facie* case of disability discrimination, the burden of production shifts to the employer to articulate a legitimate,

nondiscriminatory reason for the adverse action against plaintiff. Once the employer discharges this burden of production, the employee must demonstrate that the proffered reason was, in fact, a pretext for unlawful disability discrimination. *Brenneman v. MedCentral Health System,* 366 F.3d 412, 417-418 (6th Cir. 2004).

### B. Plaintiff is Disabled

It is undisputed that Defendant regarded Plaintiff as suffering from paranoid delusions. Defendant makes one offhand comment in its argument section that it "did not know or perceive him to have a disability", but then never makes an argument on that issue. ECF No. 25, Page ID.165 Plaintiff also received two return to work clearances, with no restrictions, including one from the facility where Defendant placed him. A return to work with no restrictions is a clear indication that he was qualified to return to his job. The facts are clear that Defendant regarded Plaintiff as being disabled, and Defendant has abandoned any argument to the contrary.

### C. Plaintiff was Qualified for the Position

Defendant also makes a cursory statement that Plaintiff was not qualified for the position because he "had a fever and was not feeling like himself." **ECF No. 25**, Page ID.166. Defendant makes no further argument on this issue. Plaintiff was certainly qualified for the position of resident physician at Ascension. He had the requisite degree and training. He had worked in the position for several months.

Most importantly, Defendant does not argue that he was not returned to the position due to his inability to perform the job. The only basis for Defendant's decision to remove him from the residency program was his alleged failure to follow their post-medical leave requirements. This is not a qualification issue.

### D. Plaintiff Suffered an Adverse Employment Action

It is also undisputed that Plaintiff suffered an adverse employment action when he was removed from the residency program. Defendant makes no argument on this issue, beyond one clause of one sentence summarily stating that "there was no adverse employment action." **ECF No. 25**, Page ID.166 Even if there was some dispute on this issue, Defendant has abandoned it.

### E.  The Adverse Employment Action was Taken because of his Perceived Disability

Defendant's action of removing him from the program was directly due to his disability. Plaintiff was on medical leave due to Defendant's perception that he was suffering a mental health issue. They refused to allow him to return to work following this medical leave. The medical leave was due to a disability, and Defendant would not allow him to return to work due to that disability, unless he had the proper documentation pursuant to his residency agreement.

This particular element of the prima facie case is inexorably tied into the issue of whether the Defendant's reasons for the adverse employment action were pretext

for discrimination. Therefore, Plaintiff adopts in full the argument below on the issue of pretext.

### F. Defendant's Expressed Reasons for Non-Renewal of Plaintiff's Employment are Pretextual

In granting summary judgment for the Defendant, the trial court held that "[a]ssuming that the Court were to find Dr. Elzein made a *prima facie* case of disability discrimination, under the *McDonnell Douglas*[7] framework, no reasonable jury could find that Ascension's reason for termination was pretextual." **R.E. No. 31**, Page ID 616.

Notably in this case, the Defendant articulated a non-discriminatory basis for its actions down below. It argued that Plaintiff failed to abide by the terms of his Resident Training Agreement when he returned to work in November 2020. However, this was in fact a clear pretext for discrimination. A plaintiff may prove pretext for discrimination by introducing direct or circumstantial evidence of discrimination. A plaintiff may refute the legitimate, nondiscriminatory reason articulated by the employer as pretext "by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Risch v Royal Oak Police Dep't*, 581 F3d 383 (6th Cir 2009).

---

[7] Derived from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Here, Defendant's actions had no basis in fact and did not actually motivate Plaintiff's removal from the residency program. Defendant's sole basis for determining that he could not return to the program was that he had to be seen by Dr. Vosburgh before he was allowed to come back to work. *See* **R.E. 26-19**, 12/4/2020 email from HR representative Marney Daughterty ("As required under the terms of the resident agreement, we need you to be seen by Dr. Vosburgh before returning to work") and **R.E. 26-19**, 12/9/2020, email from Daugherty ("As a reminder we need you to see Dr. Vosburgh before returning to work"). Defendant, who relies solely on the Resident Agreement, placed far more stringent requirements on Plaintiff than what is required by the Agreement.

In analyzing the issue, the place to start is with the language in the contract upon which the Defendant relies. Section II.G of the Resident Training Agreement states:

> **Absences**. Resident Physician must notify the Program Director or his/her designee regarding any absence for any reason. Illness causing absence for longer than two days must be certified by Resident's private physician or hospital employee health department . . . **R,E. No. 26-22**, Page ID 451.

Defendant is arguing that this provision states that Plaintiff can only be returned to work if he receives a clearance from Dr. Vosburgh. This is clearly wrong.

First, the language of the agreement itself does not even mention "return to work". It does require a certification, but the plain language makes clear that the

"illness" must be certified, not any return to work. The sentence states that an "illness … must be certified". It does not state that a clearance to return to work must be certified, only the illness. Courts will not depart from the plain meaning of a contract. *Dillon v. DeNooyer Chevrolet Geo*, 217 Mich. App. 163, 550 N.W. 2d 846 (1996). If the contract language is clear and unambiguous, interpretation is limited to the actual words used and an unambiguous contract must be enforced according to its terms. *Ajax Paving Indus, Inc v Vandenbosch Constr Co.*, 289 Mich. App. 639, 797 N.W. 2d 704 (2010) Here, the plain terms of the agreement relate to certification of the illness, not the clearance for return to work. Further, even if it were to be deemed ambiguous, the provision would be construed against Defendant because it was the drafter of the contract. *Klapp v United Ins. Grp Agency, Inc.*, 468 Mich. 459; 663 N.W. 2d 447 (2003); *Quade v Anderson*, 829 F Supp. 220 (WD Mich. 1993).

Defendant clearly already knew about Plaintiff's perceived illness, since it was the one to have him involuntarily committed to Havenwyck Hospital, therefore there was nothing for anyone to "certify" since it was the Defendant itself who put him off work. This demonstrates the second method of proving pretext: the alleged nondiscriminatory reason did not actually motivate the Defendant's actions against Plaintiff.

Further, Defendant's insistence that only Dr. Vosburgh could clear him to return to work proves that their stated reason is false. Defendant claims that Plaintiff

was placed on involuntary leave and removed from the residency program because he failed to abide by the terms of the Resident Agreement. But it was Defendant, not Plaintiff, who violated the agreement. There is nothing in the agreement that states that Plaintiff has to receive a clearance from Dr. Vosburgh after an absence of two or more days.

Defendant refused to accept his return to work note from Havenwyck, but only after this lawsuit was filed did it ever articulate that the reason for that was it was signed by a social worker, not a physician. Defendant's HR representative testified that the Havenwyck was insufficient because it was from a social worker. When asked, she testified that she could not remember if she ever told Dr. Elzein why the Havenwyck note was rejected. She was then asked "whose job it would have been to communicate to Dr. Elzein" that the Havenwyck note "was insufficient". She responded "Mine or the leaders". By "leaders" she then clarified that she meant Dr. Pawlaczyk. (**Exhibit 17**, Deposition of Marney Daugherty, p. 33). Dr. Pawlaczyk testified that she never told Dr. Elzein that the Havenwyck was insufficient only due to it being signed by a social worker. (**Exhibit 4**, Deposition of Pawlaczyk, p. 72). Defendant made sure not to communicate to Dr. Elzein the reason that his note from his treating facility was insufficient. This is clear evidence that their stated reason was pretext.

The trial court held that "[n]ot only does Section II.G of the Resident Training Agreement require certification of illness after a resident is absent for more than two days, Section III.B.(ii) of the Resident Training Agreement requires Residents, prior to performing professional medical services, to complete a physical examination by a physician of Ascension's choice." **R.E. No. 31**. Page ID 617. The trial court unaccountably finds that the Defendant's absolute commitment to Plaintiff seeing no other doctor for clearance to return to work than Dr. Vosburgh was more innocuous than pretextual, given the Resident Training Agreement. But the Agreement does not explain the Defendant's unyielding position here.

Defendant's insistence raises the question: why only Dr. Vosburgh? The answer is that Dr. Pawlaczyk had been feeding Dr. Vosburgh negative information about Dr. Elzein prior to his return to work. On November 19, 2020, four days prior to Dr. Elzein's attempt at returning to work, Dr. Pawlaczyk sent a lengthy email to Dr. Vosburgh which provided copious information related to her belief that he was deficient in his progression in the program, and almost no discussion about his actual medical leave. **R.E. No. 26-23.** If his only role was to determine a clearance for return to work following a medical leave, this information is irrelevant. This was not a performance review. This was about whether he had recovered sufficiently from the alleged medical condition that caused Defendant to have him committed in the first place. Dr.Pawlaczyk was clearly trying to create an incredibly negative

impression of Dr. Elzein to Dr. Vosburgh in order to keep Plaintiff from returning to work. That is why it had to be Dr. Vosburgh and no one else.

Defendant has no legitimate explanation for why it was so adamant that Dr. Elzein only be cleared by Dr. Vosburgh, because there is none. In her deposition, the HR representative, Marney Daugherty, testified: "Q: So it had to be Vosburgh. Okay. Why did it have to be Vosburgh? A: That's who we asked him to go see to be returned to work. Q: Is that the only reason? A: I don't know." (**Exhibit 17**, p. 37). They have no legitimate explanation because there is none. The trial court held that "[t]he purpose [of the physical examination by Defendant's choice] is to demonstrate the Resident is able to provide the services required under the Resident Training Agreement." **R.E. No. 31**, Page ID 616. But the trial court never does clarify, why that choice should only have been Dr. Vosburgh, with whom Plaintiff had reason to be uncomfortable. It further found that "[a]s Ascension argue, Dr. Elzein's job was 'direct patient care' and 'as such, there was a business necessity to ensure that Residents are in good physical and mental health.'" **R.E. No. 31**, Page ID 617. The trial court did not articulate why this goal would not have been met with another doctor who was not as compromised as Dr. Vosburgh was.

33

## II.    PLAINTIFF WAS SUBJECTED TO HARASSMENT BASED UPON RACE, NATIONAL ORIGIN AND RELIGION

### A. Plaintiff Exhausted his Administrative Remedies as to his Harassment based on National Origin Claim

In his Complaint, Plaintiff alleges a count of "Race and National Origin Based Harassment." **R.E. No. 1**, Page ID. 10. Down below, Defendant argued that Plaintiff did not check the box labeled "National Origin" on his EEOC Charge. However, the law makes clear that it is the content, not the form that matters with regard to EEOC exhaustion requirement. For an EEOC filing to constitute a charge necessary to exhaust an employee's administrative remedies under Title VII, the filing (1) must be "verified"—that is, submitted under oath or penalty of perjury, (2) must contain information that is "sufficiently precise to identify the parties, and to describe generally the action or practices complained of," and (3) must request that the agency take remedial action to protect the employee's rights. *Williams v CSX Transp Co*, 643 F3d 502 (6th Cir 2011).

Here, Plaintiff's charge included the statement that when he was praying he was told by a fellow resident to "go back where I came from" (**Exhibit 24).** This is offensive comment is directly related to national origin, and is sufficient to describe the action complained of. However, Plaintiff's race and national origin harassment claims are so intertwined (which is why they were brought in one count) that Plaintiff is willing to have that evidence used in relation to his claim for racial harassment.

34

### B.  The Harassment was Severe or Pervasive

Defendant argued down below that the comments endured by Plaintiff are not sufficiently severe or pervasive as to violate Title VII. The comments and harassment that he suffered were enumerated *supra*. The law requires only that the harassment need be severe or pervasive. *Meritor Sav Bank, FSB v. Vinson*, 477 US 57, 67 (1986) These were not isolated incidents. Plaintiff was only employed with Ascension for four months (July to early November). Described above are four incidents that occurred in a compressed time frame. This qualifies as pervasive. Further, they are quite severe, including use of the word n----er, interrupting Plaintiff during his prayer in order to make a xenophobic comment to go back to where he came from and comparing black culture to "sputum culture". This behavior certainly meets the "sever" requirement. Courts are directed to consider a totality of the circumstances as opposed to specific incidents in isolation, when determining whether a hostile work environment exists. *Williams v. General Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999). Weighing the totality of the circumstances here, it is clear that Plaintiff suffered a severe and pervasive harassment.

The trial court held that "[h]ere, the four incidents are certainly serious, however, even considering the facts in the light most favorable to Dr. Elzein, he asserts no evidence in which a reasonable jury could find that they were so serious as to alter the conditions of his employment." **R.E. No. 31**, Page ID 620. But the

trial court appears to have fallen short of evaluating the case based on a totality of the circumstances. The fact is that these occurrences transpired within a relatively short period of time, and Defendant had found that Plaintiff was in fact suffering psychological effects foisted upon him by his position. There can be no more of a serious incident than using the 'n' word in the presence of a black person, with all of the nefarious history of murder and mayhem that the word connotes.

## III.   PLAINTIFF HAS ESTABLISHED A VIABLE CLAIM FOR RETALITATION

Defendant argued down below that Plaintiff has not established a prima facie claim for retaliation. The elements of a claim for retaliation are that: (1) Plaintiff engaged in protected activity, (2) It was known by the defendant, (3) Plaintiff suffered adverse employment action and (4) There is a causal connection between the adverse employment action and the protected activity. *Donald v. Sybra*, 667 F.3d 757, 761 (6th Cir 2011). Defendant challenged the fourth element.

Plaintiff agrees that the *McDonnell Douglas* burden shifting analysis applies to this retaliation claim as well. As such, Plaintiff is required to show that the Defendant's stated reasons for his involuntary leave and eventual removal are pretext for retaliation. Therefore, the same pretext analysis described above applies here as well. Defendant's alleged non-retaliatory basis for the adverse employment action (violation of the Resident Training Agreement) has no basis in fact. For the

same reasons set forth in Section II(e) above, summary judgment on Plaintiff's retaliation claim is not appropriate.

The trial court held that "[b]ecause no reasonable jury could find that the termination was tied to his reporting of the harassment, the Court finds that Dr. Elzein fails to make a *prima facie* case and for that reason alone, summary judgment is proper as a matter of law." **R.E. No. 31**, Page ID 623. In doing so, the trial court did acknowledge that Defendant's termination of Plaintiff was in fact an adverse action. The trial court therefore engaged in an analysis of the Defendant's the pattern and practice in this case. Defendant – through its employees – had espoused a pattern of escalating any of Plaintiff's complaints, and using them against him. For example, while he only divulged that he saw an unknown figure deposit equally unknown materials into a locker in the lounge, this was made to seem as though Plaintiff had said that it was a bomb that was deposited in the locker. At every turn, Plaintiff's own transparency about what he was enduring was used against him, until he was ultimately fired.

## IV.  PLAINTIFF HAS ESTABLISHED A CLAIM FOR FALSE IMPRISONMENT

Plaintiff's last count down below was a state claim for false imprisonment. The trial court declined to make a ruling on the merits and declined exercising its jurisdiction on this count because "[t]his Court applies a strong presumption against the exercise of supplemental jurisdiction once federal claims have been dismissed."

R.E. No. 31, Page ID 624, citing *Packard v. Farmers Ins. Co. of Columbus Inc.*, 423 F. App'x 580, 584 (6th Cir. 2011).

False imprisonment is the unlawful restraint of an individual's personal liberty or freedom of movement. M Civ JI 116.02. The elements of a false imprisonment claim are: (1) plaintiff was restrained, detained or confined by defendant and thereby deprived of their personal liberty or freedom of movement, (2) the imprisonment was against the plaintiff's will, (3) the imprisonment was accomplished by actual force or express or implied threat of force, (4) defendant intended to deprive plaintiff of their liberty and (5) the imprisonment was unlawful. M Civ JI 116.21.

Defendant's argument down below was that the deprivation of liberty is not unlawful. However, Defendant did make one statement that seemed to suggest that Plaintiff was not in fact imprisoned, that "nothing prevented him from walking out at any time" while he was in the ER. **ECF No. 25**, Page ID.176. However, a picture (or in this case a video) is worth a thousand words. The videos in the emergency room paint a much different picture than the one stated by Defendant. In the video, Dr. Elzein is told that "this is the way it will go down. We're going to cut your clothes off you. So we're going to put you in restraints and cut your clothes off.[8]

---

[8] This comprised Plaintiff's Response to Defendant's Motion for Summary Judgment, **Exhibit 15**, as was delivered to the trial court in the traditional manner, as there was no other way to ensure that the trial court had access to it.

(**Exhibit 15).** Defendant's argument that he was able to just "walk out at any time" is specious.

The real issue is whether the imprisonment was unlawful. Defendant's actions of physically depriving him of his liberty in order to have him involuntarily committed to a psychiatric facility is governed by the Michigan Mental Health Code. MCL 330.1403 states that "Individuals shall receive involuntary mental health treatment only pursuant to the provisions of this act". The code then lays out a detailed process, which was the only way in which Defendant had a legal right to imprison Plaintiff for alleged mental health treatment. MCL 330.1434 states that an individual 18 years or over may file a petition with the probate court that a person requires treatment. What it does not state is that a person, such as Defendant's representatives, can just unilaterally decide that someone can be locked into a psychiatric facility with no court involvement. MCL 330.1434 states all of the contents required for the petition, including a clinical certificate from a physician. Defendant obtained all of these, but never filed them with any probate court. MCL 330.1435 states that, once the probate court receives the petition, if it is not accompanied by a certificate from a psychiatrist, then the court shall order the individual to be examined by a psychiatrist. Again, this is the probate court's domain, not Defendant.

The most important statutes are MCL 330.1437 and 330.1438. First, MCL 330.1437 states that "unless the individual has been ordered hospitalized pursuant to section 438, he shall be allowed to remain in his home or other place of residence pending an ordered examination or examinations and to return to his home or other place of residence upon completion of the examination or examinations." (emphasis added) MCL 330.1438 states that if it appears "to the court that the individual requires immediate assessment", the court "may order the individual hospitalized". Again, this is the Court's prerogative, not the Defendant's. Defendant threatened Plaintiff with restraints, involuntarily placed him into an ambulance and locked him into a psychiatric facility, with no access to his phone or ability reach the outside world. Defendant's failure to even file the petition with probate court violates almost every provision of the Mental Health Code. This was not a lawful imprisonment.[9]

The facts are clear from the very beginning in this case that Plaintiff was not free to leave. There could be no clearer statement made of Plaintiff's predicament than the two security guards who approached him, a wheel chair in tow, even though

---

[9] Although the instant case is of a civil nature, Defendant's actions arguably suffice for a kidnapping charge. As the Michigan Supreme Court has held:

> [T]hree of the six formulations of kidnapping within the Michigan statute do not require a showing of specific intent:
> (1) forcible confinement or imprisonment of another within this state;
> (2) secret confinement or imprisonment of another within this state; or
> (3) forcible carrying or sending of another out of this state.

*People v. Jaffray*, 445 Mich. 287; 519 N.W.2d 108 (1994).

Plaintiff ambulates without any issues. The message was clear that if Plaintiff did not voluntarily consign himself to the tender mercies of the emergency room and its employees, he would be compelled to do so.

## CONCLUSION AND RELIEF REQUESTED

For the reasons articulated *supra*, the Plaintiff prays that this Court reverse the trial court's holding that the Defendant is entitled to summary judgment, and remand this case back to the trial court for proceedings consistent therewith.

STEMPIEN LAW, PLLC


By:    /s/ Eric Stempien
ERIC STEMPIEN (P58703)
Attorneys for Plaintiff
38701 Seven Mile Rd., Suite 130
Livonia, MI 48152
(734) 744-7002
eric@stempien.com

Dated: March 30, 2025



## DESIGNATION OF APPENDIX CONTENTS OF PLAINTIFF-APPELLANT

Pursuant to Rule 30(b) of the Sixth Circuit Court of Appeals, Plaintiff-Appellant hereby designates the following filings or record entries in the Eastern

District Court of Michigan as items to be included in the Joint Appendix in addition

to any referenced by Defendant-Appellees:

| DESCRIPTION OF ENTRY | DATE FILED | RECORD ENTRY | PAGE ID # |
|---|---|---|---|
| The Plaintiff's Deposition Transcript | 03/25/24 | R. 26-2 | 342-363 |
| Deposition of Tammy Gauthier | 03/25/24 | R. 26-3 | 365-367 |
| Mark Vogel's Deposition Transcript | 03/25/24 | R. 26-4 | 369-370 |
| Deposition Transcript of Dr. Pawlaczyk | | R. 26-5 | 372-375 |
| Dr. Caloia's Deposition Transcript | | R. 26-6 | 377-379 |
| Clinical Certificate | | R. 26-7 | 381-384 |
| CCDA Provider Discharge Summary | | R. 26-8 | 386-389 |
| Psychosocial Assessment | | R. 26-9 | 391-395 |
| Deposition Transcript of Kathleen Scott | | R. 26-10 | 397-399 |
| Havenwyck Hospital Records | | R. 26-12 | 402-416 |
| Return to Work with No Restrictions Certification | | R. 26-13 | 417-418 |
| Interview Notes with Plaintiff), Confidential – Subject to Protective Order | | R. 26-14 | 419 |
| Medical Status Report – Ascension Genesys Hospital | | R. 26-15 | 420 |
| Email from Shakun Pacer to Burhan Tajour, Confidential – Subject to Protective Order | | R. 26-16 | 422-426 |

| | | | |
|---|---|---|---|
| Marney Daugherty's Deposition Transcript | | R. 26-17 | 428-430 |
| Email from Plaintiff to Daugherty – Confidential, Subject to Protective Order | | R. 26-18 | 432-433 |
| 12/4/2020 and 12/9/2020 emails from Daugherty to Elzein | | R. 26-19 | 435-436 |
| Trial Court Opinion and Order | 09/25/24 | R. 31 | 604-625 |
| Plaintiff's Complaint | 10/4/22 | R. 1 | |
| Defendant's Motion for Summary Judgment | 02/29/24 | R. 25 | 146-176 |
| Plaintiff's Response to the Defendant's Motion for Summary Judgment | 03/25/24 | R. 26 | 306-338 |
| Defendant's Reply Brief in Support of its Motion for Summary Judgment | 04/05/24 | R. 29 | 476-485 |

## CERTIFICATE OF COMPLIANCE

The instant Brief on Appeal as submitted by the Plaintiff-Appellant contains 9,623 words, inclusive of the table of contents and the table of authorities. The foresaid Brief was prepared using Microsoft Word, in the Times New Roman style, and with a 14-point font.

STEMPIEN LAW, PLLC

BY:    /s/ Eric Stempien_____
ERIC STEMPIEN (P58703)
ATTORNEYS FOR PLAINTIFF
38702 SEVEN MILE RD., SUITE 445
LIVONIA, MI 48152
(734)744-7002
Dated: March 31, 2025                eric@stempien.com

**CERTIFICATE OF SERVICE**

I hereby certify that on **March 31, 2025** I electronically filed the foregoing Brief on Appeal of the Plaintiff-Appellant with the Clerk of the Court using the ECF system, which will send notification of such filing to all parties of record. I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participants: None.