UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

---

CIVIL ACTION Nos.: 24-1917

---
---

AHMED ELZEIN

Appellant

-vs-

ASCENSION GENESYS HOSPITAL

Appellee

---
---

On Appeal from the Opinion and Order Granting Defendant's
Motion for Summary Judgment of the
United States District Court for the
Eastern District of Michigan – Southern Division
Hon. Brandy R. McMillion
Originating Case No.: 2:22-cv-12352

---

**BRIEF OF APPELLEE ASCENSION GENESYS HOSPITAL**

JACKSON LEWIS P.C.
BY:   Maurice G. Jenkins (P33083)
        Michelle J. LeBeau (P51440))
2000 Town Center, Suite 1650
Southfield, MI 48075
(248) 936-1900
Maurice.Jenkins@jacksonlewis.com
Michelle.LeBeau@jacksonlewis.com

**CORPORATE DISCLOSURE STATEMENT**
**PURSUANT TO FRAP 26.1**

Ascension Genesys Hospital hereby states that it is a nonprofit corporation organized under the laws of Michigan; a) a subsidiary of Henry Ford Health System and b) Henry Ford Health System is not a party to this lawsuit.

# **TABLE OF CONTENTS**

**CORPORATE DISCLOSURE STATEMENT  PURSUANT TO FRAP 26.1 ..I**

**I.    STATEMENT IN SUPPORT OF ORAL ARGUMENT ............................1**

**II.   STATEMENT OF JURISDICTION....................................................2**

**III.  COUNTER STATEMENT OF ISSUES ..........................................3**

**IV.   SUMMARY OF ARGUMENT.........................................................5**

**V.    STATEMENT OF UNDISPUTED FACTS......................................7**

**VI.   STATEMENT OF THE CASE........................................................12**

   A.   AGH AND IT'S RESIDENCY PROGRAMS ........................................12
   B.   ELZEIN AND HIS RESIDENCY ..........................................................13
   C.   AGC ISSUES A REMEDIATION PLAN TO HELP ELZEIN IMPROVE....................14
   D.   ELZEIN'S CONCERNING BEHAVIOR ON NOVEMBER 11, 2020........................15
   E.   ELZEIN'S LEAVE OF ABSENCE AND HIS ATTEMPTS TO RETURN TO RESIDENCY WITHOUT APPROPRIATE MEDICAL CLEARANCE ................................18
   F.   ELZEIN'S NOVEMBER 30, 2020 COMPLAINT TO HUMAN RESOURCES ...........19
   G.   ELZEIN'S ONGOING FAILURE TO PROVIDE RETURN TO WORK CLEARANCE.21

**VII.  PROCEDURAL HISTORY..............................................................22**

**VIII. STANDARD OF REVIEW ............................................................23**

**IX.  LAW AND ARGUMENT..................................................................25**

   A.   ELZEIN'S CLAIM FOR DISABILITY DISCRIMINATION FAILS AS A MATTER OF LAW............................................................................................25
   B.   ELZEIN WAS NOT SUBJECTED TO ANY UNLAWFUL HARASSMENT BASED ON HIS RACE, NATIONAL ORIGIN, OR RELIGION AS A MATTER OF LAW. ...................31

     *1.Elzein failed to exhaust his administrative remedies as to his national origin claim.*        32

     *2.The District Court Correctly Found That Elzein's unsubstantiated allegations of isolated comments do not rise to the level of harassment.*.....................................33

*3.The District Court Correctly Held That Elzein's Allegation of a Single Comment About Religion Cannot Establish Harassment.* ........................................................ 33

*4.Elzein's Harassment Claim Fails Since AGH Promptly Investigated The Single Concern Elzein Made Known on November 30, 2020* ........................................... 34

   C.   ELZEIN'S CLAIM OF RETALIATION FAILS AS A MATTER OF LAW .................. 35

   D.   ELZEIN'S FALSE IMPRISONMENT CLAIM FAILS AS A MATTER OF LAW ........ 37

**X.**    **CONCLUSION** ............................................................................................ **39**

*CERTIFICATE OF COMPLIANCE* .................................................... 41

*CERTIFICATE OF SERVICE* ............................................................ 42

*ADDENDUM* ....................................................................................... 43

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adams v. Nat'l Bank of Detroit*, 444 Mich. 329, 341 (1993) .................................38

*Alexander v Gardner-Denver Co*, 415 US 36, 47 (1974) ......................................32

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-248 (1986) ...........................24

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ..................................24

*Arthur v. Am. Showa, Inc.,* 625 F. App'x 704, 708 (6th Cir. 2015) .......................25

*Blair v. Henry filter Inc.* 505 F3d 517,533 (2007) ...............................................26

*Bonkowski v Arlan's Department Store*, 383 Mich 90, 96-97 (1970) .....................38

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ..............................................24

*Chen v. Dow Chem. Co.,* 580 F.3d 394, 400 n.4 (6th Cir. 2009) ...........................26

*Clarke v K-Mart Corp*., 197 Mich. App. 541, 546 (1992) .....................................37

*Copeland v. Machulis*, 57 F.3d 476, 478 (6th Cir. 1995) ......................................24

*Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) ..............................24

*Dabish v. Chrysler Motors Corp.,* 902 F.2d 32; 1990 U.S. App. LEXIS 7680, *2
    (6th Cir. May 9, 1990) .....................................................................................33

*Denman v. Davey Tree Expert Co.,* 266 F. App'x 377, 379 (6th Cir. 2007) ...........28

*DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir.2004) .............................................23

*Donald v. Sybra,* 667 F.3d 757, 761 (6th Cir. 2012) ..............................................35

*Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998) ...................................32

*Harris v. Forklift Systems, Inc.,* 510 U.S. 17 (1993); *Hafford v. Seidner,* 183 F.3d
    506, 512 (6th Cir. 1999) ..................................................................................32

*Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 23 (1993) ........................................32

*Hess v Wolverine Lake*, 32 Mich. App. 601, 604 (1971) .......................................38

*Kenney v. Aspen Techs., Inc.,* 965 F.3d 443(2020) ...............................................35

*Klepper v. First Am. Bank*, 916 F.2d 337, 341-42 (6th Cir. 1990) .........................24

*Ladd v. Grand Trunk Western R.R.,* 552 F.3d 495, 500 (6th Cir. 2009) ................32

*Lewis v. Humboldt Acquisition Corp.,* 681 F.3d 312, 318 (6th Cir. 2012) .............26

*Manzer v. Diamond Shamrock Chems*. Co., 29 F.3d 1078, 1084 (6th Cir. 1994) ...35

*Marsh v. Associated Estates Realty* Corp., No. 10-14120, 2012 U.S. Dist. LEXIS
    48453, at *20-21 (E.D. Mich. Apr. 5, 2012) ...................................................25

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) ..................... 25, 26

*Miller v. CVS Pharm Inc.* 779 F. Supp 2d 686 (E.D. Mich 2011) .........................38

*Moore v. Detroit*, 252 Mich. App. 384, 387 (2002) ......................................... 37, 38

*Oncale v. Sundowner Offshore Serv.,* 523 U.S. 75, 80 (1998) ...............................31

*Prieur v. Acuity*, 143 F. Supp. 3d 670, 674 (E.D. Mich 2015) ..............................38

*Scott v. Harris*, 550 U.S. 372, 380 (2007) ...........................................................24

*Stowers v. Wolodzko, 386 Mich 119, 134 (1971)* ....................................................37

*Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008) ...........................................................................................................26

*Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 306 (6th Cir. 2016) ...............25

*Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 257 (1981) ..............26

*Tuttle v. Metropolitan Gov't of Nashville*, 474 F.3d 307, 320 (6th Cir. 2007) ........35

**Statutes**

28 U.S.C. § 1291 ........................................................................................................ 2

28 U.S.C. 1331 ........................................................................................................... 2

42 U.S.C. § 12111 ................................................................................................... 25

42 U.S.C. § 12112(d)(4)(A) .................................................................................... 28

42 USC §20000e-5(f)(1) ......................................................................................... 32

**Rules**

29 C.F.R. § 1630.14(c) ............................................................................................ 28

Fed. R. Civ. P. 56 .................................................................................................... 23

Fed. R. Civ. P. 56(c) ..........................................................................................23, 24

## I.     STATEMENT IN SUPPORT OF ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34 and 6 Cir. R. 34, Appellee respectfully requests oral arguments. Appellee welcomes the opportunity to clarify Appellant's attempts to distort and misrepresent the record at oral argument; to ensure that this Court is clear on the admissible evidence of record; to address any questions that this Court may have concerning the specifics of the parties' positions on appeal; and to assist this Court in evaluating the true nature of this appeal.

## II.    STATEMENT OF JURISDICTION

The parties agree that this Court has jurisdiction to resolve their dispute. This Court has jurisdiction pursuant to 28 U.S.C. § 1291 since this case involves an appeal of a decision by the Federal District Court for the Eastern District of Michigan. The District Court had jurisdiction over the claims raised in the underlying lawsuit pursuant to 28 U.S.C. 1331 as the underlying Complaint raised federal questions in the form of alleged violations of Title VII of the Civil Rights Act of 1964. The District Court rendered its final decision on September 25, 2024, which decision disposed of all claims. Jurisdiction over the instant appeal of Order Granting the Defendant's Motion for Summary Judgment is conferred upon this Court by 28 U.S.C. § 1291 as an appealable final decision. Appellant filed a timely notice of appeal on October 17, 2024.

## III.   COUNTER STATEMENT OF ISSUES

The primary issues presented upon appeal by Appellant (Elzein Brief on Appeal, Page: 10), as restated, is as follows:

**ISSUE No. 1: Was the Defendant entitled to Summary Judgment as a matter of law when there is no genuine issue of material fact and the record blatantly contradicted Plaintiff's version of events?**

Appellee answers "Yes"
Appellant answers "No"
District Court answers "Yes"

**ISSUE No. 2: Was the Defendant entitled to Summary Judgement as a matter of law when there is no genuine issue of material fact, and the record establishes Defendant did not consider Plaintiff to be disabled at the time his contract was not renewed?**

Appellee answers "Yes."
Appellant answers "No"
District Court answers "Yes"

**ISSUE No. 3: Was Defendant entitled to Summary Judgement when the record indisputably establishes Plaintiff obtained a return-to-work clearance based on false information and Plaintiff subsequently refused to provide a return-to-work clearance in compliance with his Residency Training Agreement?**

Appellee answers "Yes"
Appellant answers "No"
District court answers "Yes"

**ISSUE No. 4: Was Defendant entitled to Summary Judgment when nonrenewal of Plaintiff's contract was based on legitimate non-discriminatory and non-retaliatory reasons – Plaintiff's undisputed failure to provide a return-to-work clearance in compliance with his Residency Training Agreement?**

Appellee answers "Yes"

Appellant answers "No"
District court answers "Yes"

**ISSUE No. 5: Was Defendant entitled to Summary Judgement when there is no genuine issue of material fact and Plaintiff failed to establish a *prima facie case* of harassment based on five discrete incidents which he failed to report?**

Appellee answers "Yes"
Appellant answers "No"
District court answers "Yes"

## IV.   SUMMARY OF ARGUMENT

Ahmed Elzein (Elzein) was a first year Resident in the Internal Medicine Residency Program at Defendant Ascension Genesys Hospital (AGH). After completing less than five (5) months of his first year of Residency, Elzein was granted a medical leave of absence after which, despite several prompts by AGH, he failed to submit the requisite medical clearance to return to work as mandated by the terms of his Resident Training Agreement. He now brings suit alleging: (1) perceived disability discrimination in violation of the Americans with Disabilities Act; (2) race, religious and national origin harassment in violation of Title VII; (3) unlawful retaliation in violation of in violation of Title VII; and (4) false imprisonment in violation of Michigan law.  These claims are wholly without merit and warrant a grant of summary judgment for AGH.

Elzein's claim of perceived disability discrimination fails as a matter of law because there is no record evidence that AGH perceived Elzein as disabled nor did any causal connection exist between Elzein's episode on November 11, 2020 (during which time his own psychiatrist testified that Elzein was suffering from delusions, required hospitalization and could not work) and AGH's inability to renew his Resident Training Agreement in April of 2021 due to Elzein's refusal to submit the requisite medical clearance to return to work.

Elzein's claims of race and national origin harassment fail because: (1) the

5

conduct at issue was not sufficiently severe or pervasive as to alter the conditions of his employment such that a reasonable person would view it as an abusive or hostile work environment; and (2) Elzein failed to utilize any of the myriad of reporting mechanisms to make any concerns of race or national origin harassment known to AGH.

Similarly, Elzein's claim of religious harassment fails because the single instance of purported harassment on his last day of work is legally insufficient to create a hostile work environment and, in any event, Elzein failed to raise any such concerns until nearly three weeks after his last day of work with AGH.

Elzein's claim of retaliation is not legally cognizable in that there is no causal connection between the single complaint (that another Resident purportedly told him to "go back where he came from" while Elzein as praying to Allah) he made on November 30, 2020 (three weeks after his last work day) and AGH's April 28, 2021, decision not to renew his Resident Training Agreement (because, despite multiple requests by AGH, Elzein failed to provide the medical clearance to return to work mandated by his Resident Training Agreement).

Finally, Elzein's claim of false imprisonment fails because: (1) Elzein himself conceded at deposition that he advised AGH that he "did not feel like himself" and ultimately agreed to visit the Emergency Room to be checked out medically when he began to exhibit odd behavior; and (2) was neither restrained nor otherwise forced

to go to - or stay in - the ER.

In short, each of Elzein's claims lacks merit as a matter of law and warrants the District Court's grant of summary judgment in AHG's favor as to all counts.

## V.    STATEMENT OF UNDISPUTED FACTS

Ascension Genesys Hospital (AGC) asserts that the following material facts are not in dispute in this case and support the District Court's grant of Summary Judgment as to all claims raised:

1.    Elzein graduated medical school in 2016. **R.E. No. 25-18, Page ID 278.**

2.    Elzein elected to complete his Residency in the United States. **R.E. No. 25-18, Page ID 278.**

3.    Elzein sought a placement as a Resident in Internal Medicine.

4.    Elzein did not "match" with any Internal Medicine Residency Program through the National Resident Matching Program from 2016 through 2020. **R.E. No. 25-18, Page ID 279.**

**5.**    AGH offered Elzein a spot in its Internal Medicine Residency Program after the match in 2020, which Elzein accepted. **R.E. No. 25-4.**

6.    Elzein signed a one-year Resident Training Agreement on June 16, 2020. **R.E. No. 25-4, PageID 199, 206**.

7.    The Resident Training Agreement between AGH and Elzein was for a term of one year. **R.E. No. 25-4, PageID 189.**

8.      The Resident Training Agreement between AGH and Elzein was renewable in terms in one-year terms upon the successful completion of the previous year's Agreement. **R.E. No. 25-4, PageID 189.**

9.      The Resident Training Agreement between AGH and Elzein included the following requirement at Sec. I.G: "Illness causing absence for longer than two days must be certified by Resident's private physician or hospital employee health department." **R.E. No. 25-4, PageID 191.**

10.     A Remediation Plan dated October 5, 2020, was prepared for Elzein. **R.E. No. 25-6.**

11.     On October 7, 2020, during a discussion between Elzein, Dr. Pawlaczyk (the Director of the Internal Medicine Residency Program at AGH) and Helen Kurowski, the Remediation Plan was explained and issued to Elzein. **R.E. No. 25-7.**

12.     On November 11, 2020, Elzein contacted AGH's Security department to report his belief that "someone" placed "something" which he believed to be a bomb in a locker in the on-call room at AGH. **R.E. No. 25-8, PageID 220** and **R.E. No. 25-20, PageID 290.**

13.     Security immediately came to the on-call room to investigate Elzein's report and found the report to be unsubstantiated. **R.E. No. 25-15**.

14.     On November 11, 2020, Elzein began using the camera on his phone to

video record his fellow Residents during their breaks in the on-call room. **R.E. No. 25-8,  PageID 220-223**.

15.    On November 11, 2020, Elzein advised Dr. Baj that he did not feel like himself. **R.E. No. 25-19, PageID 286.**

16.    On November 11, 2020, Elzein advised Dr. Pawlaczyk that he was feeling feverish. **R.E. No. 25-21, PageID 294.**

17.    On November 11, 2020, Elzein advised Dr. Baj that he believed an unknown fellow resident had placed a harmful object in his pocket but could not produce the object. **R.E. No. 25-8.**

18.    On November 11, 2020, Elzein advised Dr. Pawlacyzk that he had not been sleeping or eating. **R.E. No. 25-21, PageID 295.**

19.    On November 11, 2020, Elzein advised Dr. Baj that every time he closed his eyes, others in the room would draw closer to him and he believed those individuals wished him harm. **R.E. No. 25-19, PageID 286.**

20.    From November 12, 2020 through November 17, 2020, Elzein was institutionalized at Havenwyk Hospital. **R.E. No. 25-9, PageID 225- 227**.

21.    During his time at Havenwyk Hospital, Elzein was diagnosed with Psychotic Disorder and his treating psychiatrist observed that "[h]e was paranoid and delusional. **R.E. No. 25-9, PageID 225- 227.**

22.    Elzein's treating physician at Havenwyk Hospital testified that Elzein

was suffering from delusions and unable to work from November 12, 2020 through November 23, 2020. **R.E. No. 25-22, PageID 298.**

23.    On November 30, 2023, Dr. Pawlaczyk (Director of the Internal Medicine Resident Program at AGH) and Maureen Daugherty (HR Representative at AGH) spoke to Elzein via telephone and advised him that, in order for him to return to shifts as a Resident, he must provide AGH with a note either from AGH's Occupational Health or from a physician releasing him to return to work, with or without an accommodation.  **R.E. No. 25-10, PageID 229.**

24.    The first work related concern raised by Elzein to AGC's Human Resources Department was during a conversation with Marney Daugherty on November 30, 2020. **R.E. No. 25-10, PageID 229.**

25.    AGC's Equal Employment Opportunity Policy includes the requirement that if an employee believes that the policy has or is being violated, the employee "must immediately notify his/her manager, the local HR Partner, the Corporate Responsibility Officer or the Ascension Values Line." **R.E. No. 25-2, PageID 182.** ("C. Complaint & Investigation Procedure").

26.    AGC communicated to Elzein available appointment times for Plaintiff to meet with Dr. Vosburgh of AGC's Occupational Health in order to obtain the medical clearance to return to work required by Section I.G of his Resident Training Agreement.  **R.E. No. 15-16, PageID 256**.

27.     Elzein did not meet with Dr. Vosburgh of AGC's Occupational Health to obtain the medical clearance to return to work required by Section I.G of his Resident Training Agreement. **R.E. No. 25-10, PageID 229-230.**

28.     Elzein did not provide AGC with medical documentation from his private physician to clear him to return to work as required by Section I.G of his Resident Training Agreement. **R.E. No. 25-12, PageID 238.**

29.     Although he had been instructed that he could not return to work as a Resident until he provided AGC with medical clearance to return to work from either Occupational Health or his own private physician, Elzein continued to use his employee badge to attempt to gain access to AGH premises through December 11, 2020. **R.E. No. 25-15, 253-254.**

30.     On April 5, 2021, AGH provided Elzein with final written notice to provide a return-to-work certificate within 14 days or AGH would not be able to renew his contract. **R.E. No. 25-11, PageID. 236.**

31.     Elzein did not respond to AGH's April 5, 2021 letter. **R.E. No. 25-18 281**.

32.     Elzein was advised by letter dated April 28, 2021 that his Resident Training Contract could not be renewed. **R.E. No. 25-12, PageID 238**.

33.     Elzein filed an EEOC Charge of Discrimination No. 471-2021-01927 signed on May 12, 2021 at 12:07 p.m. EDT. **R.E. No. 25-13, PageID 240-241.**

11

34.     On EEOC Charge No. 471-2021-01927, Elzein did not identify national origin as a basis for his claims of discrimination. **R.E. No. 25-13, PageID 240-241.**

35.     Elzein did not timely amend his EEOC charge to identify national origin as a basis for his claims of discrimination. **R.E. No. 25-13, PageID 240-241.**

36.     The EEOC issued to Plaintiff Determination and Notice of Rights dated July 13, 2022, as to Charge No. 471-2021-01927. **R.E. No. 25-13, PageID 242.**

## VI.    STATEMENT OF THE CASE

### A.    AGH and It's Residency Programs

AGH is a hospital committed to delivering compassionate, personalized care to all with a well-established legacy of serving the diverse patient population of the Genesee County region. AGH also accepts medical school graduates into its Resident training programs where such doctors are trained to become highly skilled specialists in their respective fields. AHG is expressly committed to providing a non-discriminatory atmosphere where patients and staff alike are treated fairly and without regarding race, religion, national origin, or any other legally protected category. **R.E. No. 25-2, PageID 182**. This commitment extends to all doctors selected as Residents for one of AGH's Residency Programs. To that end, it has implemented robust anti-discrimination policies for residents which expressly prohibit discrimination, including its EEO Policy, Resident Program Handbook policies and its Resident Program Honor Code. *See also* **R.E. No. 25-3, PageID 185-**

12

186. An anti-discrimination policy was also included in section IV.B of Elzein's Resident Training Agreement. (Ex. 3). Moreover, any Resident who feels that s/he has witnessed or been the subject of unlawful discrimination has multiple avenues of complaint: an immediate supervisor, Human Resources, the Corporate Responsibility Officer, the Director of Medical Education, or the Ascension Values Line (via phone or the Internet). **R.E. No. 25-2, PageID 182.**

## B.    Elzein and His Residency

Elzein, a first year medical Resident, began his medical residency with AGH's Internal Medicine Program on June 17, 2020[1], under a one-year Resident Training Agreement which required annual renewal. (*See* **R.E. No. 25-4, PageID 189**. As part of his Residency, Elzein was required to provide direct patient care under the supervision of licensed physicians. **R.E. No. 25-4, PageID 188**. From the outset, Elzein's Residency was plagued by performance issues, the severity of which increased over time. He was frequently tardy, often went to the wrong location, had

---

[1] Medical School graduates seeking specialty training opportunities are selected as Residents by the various programs nationally through the National Resident Matching Program. Although Elzein graduated from medical school in 2016, he did not match for a residency spot through the 2020 matching season.  Instead, based on a referral from a colleague, Elzein was selected in 2020 for the program by AGH's Internal Medicine Residency Program Director (Dr. Barbara Pawlaczyk) *after* the usual residency match season set by the National Resident Matching Program. All first-year residents at AGH are assigned a mentor and Dr. Pawlaczyk chose Elzein as her formal mentee.

difficulty following directions from his superiors, was not prepared for patient rounds, did not take notes, stared absentmindedly at the computer screen, and generally seemed "lost." *See* **R.E. No. 25-5, PageID 210-211**. As time went on, the concerns about Elzein increased in seriousness, such as failing to meet minimum requirements with treating patients, difficulty in interacting with patients, failing to record physician notes, and low quiz scores, despite being provided with support, help and feedback. **R.E. No. 25-5, PageID 210-211**.

**C.    AGC Issues a Remediation Plan to Help Elzein Improve**

On September 24, 2020, the Clinical Competency Committee ("CCC") met to discuss the progress of all residents, including Elzein. *See* **R.E. No. 25-5, PageID 210-211**. The feedback from the CCC was that, while Elzein showed some improvement in meeting residency milestones, he had "a long way to go" and it was unclear whether he would be able to improve enough to progress forward in his residency. (**R.E. No. 25-5, PageID 211.**) He was also having difficulty adjusting to U.S. medical practices because he graduated from medical school in 2016 in Sudan, had not practiced medicine at all until he joined the residency program about 4 years later, and had little exposure to patient care before the residency. **R.E. No. 25-5, PageID 211.** It was also noted that because Elzein realized he was doing poorly, he was keeping to himself rather than seeking assistance. **R.E. No. 25-5, PageID 211.**

Based on input from the CCC and in an effort to bolster Elzein towards

improving his skills in light of the ongoing myriad deficiencies in his performance, a comprehensive remediation plan was prepared for Elzein on October 5, 2020. *See* **R.E. No. 25-6, PageID 213-215**. Dr. Pawlaczyk discussed this plan with Elzein on October 7. **R.E. No. 25-7, PageID 217-218.** As part of the remediation plan, Elzein's residency rotation schedule changed "to allow him to become more familiar with the health care system and program's policies." **R.E. No. 25-7, PageID 217-218**. For this changed schedule, he was to do one rotation in the outpatient clinic working 1:1 with the clinic preceptor and then do two rotations working directly with internal medicine staff "to allow for close observation, monitoring of his medical knowledge, skills and patients' care, and for coaching." **R.E. No. 25-7, PageID 217-218.**

Because Elzein was having difficulty with both academic and behavioral matters, including comprehension of straightforward directions, he was to meet with occupational health to determine work readiness. **R.E. No. 25-7, PageID 217-218**. It was also suggested that he meet with a behavioral scientist to conduct a review of his study habits and to ascertain his best learning style. **R.E. No. 25-7, PageID 217-218**.

**D.     Elzein's Concerning Behavior On November 11, 2020**

On November 10, Dr. Pawlaczyk began receiving reports from residents that there was a change in Elzein's behavior. **R.E. No. 25-21, PageID 293-294**. For example, Elzein expressed discomfort with observing a patient because he was

"convinced" the patient was violent, even though the patient was sleeping. **R.E. No. 25-19, PageID 286**. He became even more anxious, citing the presence of patients, patient visitors, and other people without badges (badges are only issued to staff of the hospital). **R.E. No. 25-19, PageID 286**. The senior resident with Elzein sent Elzein back to the on-call room due to his discomfort and planned to treat the patient alone. Elzein was also witnessed sitting in the on-call room staring at his computer screen blankly for hours. **R.E. No. 25-19, PageID 284**.

On the morning of November 11, 2020, Elzein contacted security stating that someone came into the resident's lounge, put something in the locker, and left quickly. He inexplicably believed the person placed a bomb in the locker. Elzein's bomb threat was immediately investigated but nothing was found. **R.E. No. 25-20, PageID 290**; **R.E. No. 25-8, PageID 220**. At approximately 2 p.m., Dr. Pawlaczyk received a call from the chief resident, with concerns about Elzein's increasingly strange behavior. **R.E. No. 25-21, PageID 294**; **R.E. No. 25-19, PageID 284-285**. To wit, he sat with his back to the wall in the break room recording colleagues with his phone claiming that "many strange things were happening" around him and he wanted to record these strange happenings; he stated that every time he closed his eyes, the other residents got closer to him in order to harm him, **R.E. No. 25-19, PageID 286**; and he claimed a fellow resident placed a harmful talisman in his pocket (although Elzein could not produce the purportedly harmful artifact). **R.E.**

**No. 25-8, PageID 220-223**. Elzein also admitted that he had not eaten all day, though other residents tried to encourage him to do so. **R.E. No. 25-8, PageID 220.** While Elzein suggested that he was planning to leave during his shift, his behavior was such that his fellow residents were concerned about his ability to go home alone safely. Dr. Pawalczyk, immediately arranged to come see Elzein. **R.E. No. 25-21, PageID 294**.

When Dr. Pawlaczyk arrived to speak with Elzein, he was in the food court with the senior resident, but still not eating. **R.E. No. 25-21,  PageID 294**. He also still kept his back to the walls, looking around the food court suspiciously. Elzein admitted to Dr. Pawalczyk that he had not been eating or sleeping, was not feeling like himself and may have a fever. **R.E. No. 25-21,   PageID 294**. Since his comments raised concerns for his safety, Dr. Pawlaczyk sought a consult from occupational health and was told to suggest to Elzein that he go to the nearby emergency room. When Dr. Pawlaczyk made this suggestion to Elzein, he was initially reluctant to go but ultimately agreed. See **R.E. No. 25-10, PageID 229**.

To ensure Elzein's privacy, arrangements were made for him to enter the ER through a private door and go directly to a private room. Once he was settled in the ER, no member of the residency program had any further involvement. Elzein never returned to the residency program after November 11, 2020, and raised no concerns

of discrimination prior to that date[2]. Moreover, Elzein has identified no complaints in this lawsuit pertaining to any employees of AGH relating to his brief time in the ER. **R.E. No. 1**.

**E.    Elzein's Leave of Absence and His Attempts To Return To Residency Without Appropriate Medical Clearance**

After his emergency room visit on November 11, 2020, Elzein took a leave of absence from November 12 through November 23, 2020. Discovery revealed that, during this time, Elzein was admitted to Havenwyck, a psychiatric institution, where he was treated for six days and diagnosed as having paranoid delusions by psychiatrist Dr. Yoon. **R.E. No. 25-22, PageID 298**; **R.E. No. 25-10, PageID 229-230**. His discharge was conditioned on compliance with medication and continued psychiatric treatment. **R.E. No. 25-22, PageID 298**; **R.E. No. 25-10, PageID 229-230**. Elzein did not comply with these instructions.

Because Elzein was absent for more than 2 days, under the terms of his Resident Training Agreement, he was required to present medical confirmation that

---

[2] On November 30, Elzein complained to HR that, on November 11, he was in the intern room praying when a male resident told him to "go back where he came from." Elzein claimed he reported the incident to the chief resident and Dr. Pawlaczyk. He also claimed that this complaint motivated Dr. Pawlaczyk to bring him to the ER, purportedly in an effort to discredit him.  The residents denied making or witnessing any such statement, the chief resident and Dr. Pawlaczyk confirmed Elzein made no concern known to them on November 11, and that Elzein's ER visit was occasioned solely by his bizarre behavior.

he could return to work, with or without reasonable accommodation. **R.E. No. 25-4, PageID 194**. This medical confirmation could either be obtained from a private physician or from AGH's Occupational Health. **R.E. No. 25-4, PageID 194**.

On November 23, Elzein went to Occupational Health and told the doctor that he had been out with a cold. **R.E. No. 25-14, PageID 245**. After confirming Elzein did not have COVID-19 and based on Elzein's misrepresentation that he had been off for a cold, Occupational Health cleared Elzein for return to work. **R.E. No. 25-14, PageID 245**. This clearance was revoked as soon as Elzein volunteered to a different person in Occupational Health that he provided a false reason for his absence.

Elzein was then instructed that he could not return to work as a Resident until he submitted a proper return to work certification. **R.E. No. 25-10, PageID 229**. In fact, from November 23, 2020 through April 5, 2021, AGH repeatedly instructed Elzein to submit the requisite medical certification to allow him to rejoin the Residency Program and even provided Elzein with available appointment times to visit Occupational Health. Elzein ignored these requests. Instead, Elzein repeatedly appeared in AGH's resident on-call room using his employee badge to access the premises until security removed his badge. **R.E. No. 25-18 278-281**.

**F.    Elzein's November 30, 2020 Complaint To Human Resources**

On November 30, 2020, Dr. Pawlaczyk and HR spoke with Elzein via phone

19

to remind him that AGH still needed a note from either his personal physician or Occupational Health, clearing him to return to work either with or without accommodation. **R.E. No. 25-10, PageID 229**. He agreed to provide such a note. **R.E. No. 25-10, PageID 229**. He then asked Dr. Pawlaczyk to leave the call so that he could speak to HR alone. **R.E. No. 25-10, PageID 229**.

During that discussion, Elzein complained to HR that, on November 11, he was in the intern room praying when a male resident told Elzein to "go back where you came from." **R.E. No. 25-10, PageID 229**. He further claimed that he reported the incident to his senior resident (Dr. Natalia Baj), who encouraged him to report the incident to Dr. Pawlaczyk. **R.E. No. 25-10, PageID 229**. He then alleged that his complaint about this incident caused Dr. Pawlaczyk to take him to the emergency room and that security came to the on-call floor with a wheelchair to intimidate him into going to the emergency room. **R.E. No. 25-10, PageID 229**.

HR investigated this complaint but could not substantiate it. **R.E. No. 25-10, PageID 231-34.** Both the senior resident, Dr. Baj, and Dr. Pawlaczyk denied that Elzein ever advised them of the purported comment. **R.E. No. 25-10, PageID 231-34**. Importantly, this alleged statement was not the reason Elzein went to the emergency room, and security did not intimidate Elzein into going to the emergency room.

**G.      Elzein's Ongoing Failure To Provide Return To Work Clearance.**

From November 23, 2020 through April 28, 2021, despite multiple reminders from AGH, Elzein still did not provide a physician's note clearing him to return to work either with or without accommodation. In this respect, Dr. Pawalczyk communicated with Elzein on no fewer than seven (7) separate occasions reminding him to comply with Sec. II.G of his Resident Training Agreement and provide AGC with a return-to-work certification from either Occupational Health or Elzein's own treating physician. **R.E. No. 25-12, PageID 238.**

On April 5, 2021, Dr. Pawlaczyk provided Elzein with a final written notice to provide a return-to-work certification within fourteen days or AGH would not be able to renew his contract. **R.E. No. 25-12, PageID 238**. Elzein neither provided a return-to-work certification nor otherwise responded to the April 5 letter. Consequently, he was advised by letter dated April 28, 2021, that his residency contract would not be renewed. **R.E. No. 25-12, PageID 238.**

**H.      Testimony of Dr. Yoon (Elzein's Physician)**

During his admission at Havenwyck (a facility into which Elzein checked himself in and which has no affiliation with AGH), Elzein's course of care was led by Dr. Yoon. Dr. Yoon diagnosed Elzein as suffering from paranoid ideations and a persecution complex, and further testified that Elzein was delusional in denying the nature and cause of his own behaviors, as well as lacking in self-introspection of

21

such a severity that hospitalization was required. **R.E. No. 25-9, 225- 227.** It was Dr. Yoon, and not AGH, who determined that Plaintiff's condition warranted hospitalization, prescription medication and follow-up psychiatric treatment on an outpatient basis. **R.E. No. 25-9, 225- 227; R.E. No. 25-22, PageID 298.**

Further, Dr. Yoon testified that based on his independent assessment Plaintiff's psychiatric condition warranted not only his hospitalization, but also prescriptive medication, and post-discharge outpatient psychiatric treatment. **R.E. No. 25-22, PageID 298.** There is no record evidence to indicate that AGH was involved in Dr. Yoon's assessment.

## VII.    PROCEDURAL HISTORY.

Elzein filed an EEOC Charge of Discrimination (Charge No. 471-2021-01927), signed on May 12, 2021 at 12:07p.m. E.D.T., against Ascension Genesys Hospital. Elzein did not identify national origin as a basis for his claims of discrimination in this Charge and he did not seek to amend this Charge to later include national origin as a basis for his claims of discrimination. **R.E. No. 25-13**. On October 4, 2022, Elzein filed his Complaint in the United States District Court for the Eastern District of Michigan, Southern Division. In this Complaint, Elzein alleges: (1) perceived disability discrimination in violation of the Americans with Disabilities Act; (2) race, religious and national origin harassment in violation of Title VII; (3) unlawful retaliation in violation of in violation of Title VII; and (4) false imprisonment in violation of

Michigan law. On February 29, 2024, AGH timely filed its Motion for Summary Judgment. **R.E. No. 1.** This Motion was fully briefed by both parties and, on September 25, 2024, the District Court issued its Opinion and Order Granting Defendant's Motion for Summary Judgment. **R.E. No. 31; R.E. No. 32**. In its Opinion and Order, the Court dismissed Elzein's claims under Title VII and the ADA as a matter of law and, upon dismissal of the anchor federal claims, elected not to exercise supplemental jurisdiction over Elzein's state law claim, thereby dismissing it from the lawsuit. **R.E. No. 31**. On October 17, 2024, Elzein filed his Notice of Appeal seeking review of the District Court's Opinion and Order Granting Defendant's Motion for Summary Judgment. **R.E. No. 33.**

## VIII.    STANDARD OF REVIEW

The Sixth Circuit reviews *de novo* a district court's order granting summary judgment. *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir.2004). In so doing, the Sixth Circuit will affirm a grant of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

A motion for summary judgment under Fed. R. Civ. P. 56, should be granted if the discovery record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ.

P. 56(c). The Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in her favor. *See Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995). However, a plaintiff cannot rest upon her pleadings, but is required to present significant probative evidence in support of her claims.  See *Copeland v. Machulis*, 57 F.3d 476, 478 (6th Cir. 1995). A mere scintilla of evidence is insufficient. Rather, "there must be evidence on which the jury could reasonably find" for the non-moving party. *Klepper v. First Am. Bank*, 916 F.2d 337, 341-42 (6th Cir. 1990) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Summary judgment is appropriate "against a party who fails to make a showing essential to that party's case, and on which that party will bear the burden of proof."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-248 (1986)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Id.* at 380. See also, *Marsh v. Associated Estates Realty* Corp., No. 10-14120, 2012 U.S. Dist. LEXIS 48453, at *20-21 (E.D. Mich. Apr. 5,

24

2012) ("While the Court is aware of its obligation to view the facts and all inferences to be drawn therefrom in the light most favorable to the non-moving party, this does not require the Court to accept as true plainly implausible allegations that are directly controverted by the record.").

## IX.    LAW AND ARGUMENT

### A.    ELZEIN'S CLAIM FOR DISABILITY DISCRIMINATION FAILS AS A MATTER OF LAW.

To establish a *prima facie* case of disability discrimination, Elzein must show: (1) that he was an individual with a disability, or wrongly regarded as being so, within the meaning of the Act; (2) he was qualified to perform the essential functions of his job, with or without reasonable accommodation, at the time of the alleged discrimination; and (3) he suffered an adverse employment decision, with regard to the position in question, because of his disability.  See 42 U.S.C. § 12111; *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 306 (6th Cir. 2016). A *prima facie* case is not made if the decisionmaker is unaware of the specifics of an employee's disabilities or restrictions, even if the decisionmaker has a general knowledge that a disability exists. *Arthur v. Am. Showa, Inc.,* 625 F. App'x 704, 708 (6th Cir. 2015); *Tennial*, 840 F.3d at 306. Importantly, the disability must be a 'but for' cause of the adverse

employment action." *Id.*; *Lewis v. Humboldt Acquisition Corp.,* 681 F.3d 312, 318 (6th Cir. 2012) (*en banc*).

If Elzein is able to establish his *prima facie* case, which he cannot, then the burden shifts to AGH to articulate a legitimate, nondiscriminatory reason for its actions. *McDonnell Douglas*, 411 U.S. at 802; *Talley v. Family Dollar Stores of Ohio, Inc.,* 542 F.3d 1099, 1105 (6th Cir. 2008). If AGH satisfies its burden of articulation, which it can, then Elzein must establish that AGH's articulated reason is not the true reason, but was merely pretext for illegal discrimination. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 257 (1981); *Talley*, 542 F.3d at 1105.

In order to overcome the employer's proffered reason for termination, plaintiff must provide evidence that an illegal motivation was more likely than that offered by the defendant to prove that the proffered reason for termination did not actually motivate the decision. See *Blair v. Henry filter Inc.* 505 F3d 517,533 (2007). Ultimately, "[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Chen v. Dow Chem. Co.,* 580 F.3d 394, 400 n.4 (6th Cir. 2009).

As an initial matter, there is no record evidence to support any contention that Elzein made AGH aware of any disability. To the contrary, Elzein has categorically denied suffering from any disability. As to his claim of discrimination on the basis of a perceived disability, Elzein has failed to establish a *prima facie* case of perceived

disability discrimination because there is no record evidence that AGH perceived him to have a disability, he did not establish he was qualified for the essential functions of the job and there was no adverse employment action.

### 1. There is No Record Evidence That AGC Perceived Elzein as Disabled

The record evidence reveals that Elzein himself admits that he "did not feel like himself" on November 11, 2020, thought he may be feverish and was acting differently or out of character. While these symptoms would prompt any employer to ask its employee to seek medical attention, this is nowhere near demonstrative that AGH perceived Elzein as disabled as that term is defined as a matter of law. In fact, even now, Elzein fails to identify any record evidence that AGH perceived him to be disabled. This alone is fatal to his claim of perceived disability discrimination and mandates a grant of summary judgment in AGH's favor.

### 2. Elzein Was Not Qualified To Perform The Essential Functions of a Resident From November 11, 2020 Through April 28, 2021

As a Resident, an essential function of Elzein's job is <u>direct patient care</u>. As such, there is a business necessity to ensure that Residents are in good physical and mental health. On November 11, Elzein ultimately agreed to go to the ER after acting strangely and admitting to Dr. Pawlaczyk that he had a fever and was not feeling like himself. It cannot be stressed enough that a Resident should not provide direct patient care if they have a fever or other illness. At the time, Dr. Pawlaczyk

27

suggested, and Elzein ultimately agreed, to go to the emergency room to address his acute symptoms, and ensure he was safe.

After employment begins, an employer may require medical examinations if they are job-related and consistent with business necessity. 42 U.S.C. § 12112(d)(4)(A); 29 C.F.R. § 1630.14(c). An employer's request for a medical examination is "job-related and consistent with business necessity" where, the employee's ability to perform the essential functions of the job is impaired or the employee poses a direct threat to himself or others. *Denman v. Davey Tree Expert Co.,* 266 F. App'x 377, 379 (6th Cir. 2007).

Subsequently, Elzein was hospitalized from November 11 through November 17, 2020 at Havenwyck, thereby activating Section II G of his Resident Training Agreement. This section mandated that Elzein obtain a medical certification from either his physician or Ascension's Occupational Health Department to return to work after missing two or more days due to illness. This is a requirement that applies to all Residents. Elzein failed to establish that he was qualified to perform the essential functions of the job when he failed to provide the requisite medical certification. In fact, AGH repeatedly reminded Elzein of his obligation and even went so far as to offer appointment times for Elzein to obtain his medical clearance. Elzein failed to appear. This went on for **over five months**. AGH gave the Elzein every opportunity to return to work.

### 3.    AGH Took No Adverse Employment Action Against Elzein

AGH did not take any adverse action against Elzein. Elzein remained on unpaid leave after choosing not to submit the required medical certification. AGH notes that Elzein tried to submit two inadequate medical certifications. One, based on false information that he had been out due to a cold, the second, from a social worker and not a physician. Notably, Elzein engages in a tortured analysis of AGH's return to work policy as it applies to multi-day absences due to a physician's illness or medical condition, to assert that Plaintiff was discriminatorily subjected to a higher burden than other similarly situated Resident physicians.  There is no record evidence to support any contention that Elzein was subjected to any different burden than every other Resident.   Moreover, this bare contention should be rejected because there is no genuine issue of material fact that:

a.    Elzein lied when he first returned from his leave of absence and reported to AGH's occupational health administrator that he had only been absent due to a few minor medical issues (stuffy nose and cold symptoms), medical issues wholly unrelated to the actual reason for his leave of absence; and

b.    The November 23, 2020, return to work letter from Noni Stein (a social worker at Havenwyck) was neither compliant with AGH's fitness for duty/return to work policy nor authorized by Dr. Yoon, who testified without contradiction that <u>Stein's letter was "too early" because "[Elzein] needs to be assessed by the outpatient psychiatrist" he was to consult within a week after his discharge from Havenwyck.</u>

**R.E. No. 29-1, PageID 488.** Elzein not only failed to comply with Dr. Yoon's treatment regimen, but Dr. Yoon never authorized Ms. Stein to issue such a letter,

and testified that he would <u>not</u> have signed off on Elzein's return to work as of November 23, 2020.

Moreover, AGH's policies and procedures are in place for good reason. During discovery, AGH learned that Elzein had been institutionalized with paranoid delusions during his time away from work. Elzein's own psychiatrist (Dr. Yoon) testified that Elzein was unable to work from November 12 – November 23, 2020, and required ongoing care after: Ongoing care Elzein testified he refused.

After no fewer than six attempts to cajole Elzein to simply submit the mandated medical clearance to allow him to return to his Residency, AGH again wrote to Elzein on April 5, 2021 (a seventh attempt), allowing him one final opportunity to submit the necessary medical certification.  In the April 5, 2021 correspondence, AGH articulated that failure to provide the certification would lead to non-renewal of his Resident Training Agreement. Elzein still refused to provide the requisite certification. Ultimately, AGH had no choice but make the decision not to renew the contract for another year. Elzein has adduced no evidence that this decision was in any way motivated by discriminatory animus based on a perceived disability: he simply refused to abide by the terms of his contract. Accordingly, Elzein cannot establish a *prima facie* case of disability discrimination and summary judgment for AGH is warranted as a matter of law.

**4.     There is No Record Evidence of Pretext, or that Perceived Disability Discrimination is the "But-For" Cause of Any of AGH's Actions**

Even if Elzein could somehow establish a *prima facie* case of disability discrimination (which he cannot), Elzein cannot show pretext or that disability discrimination is the but-for cause of any of AGH's employment actions. Every resident is given the same Agreement, and every resident is held to the same standards. The record contains no evidence to the contrary. Elzein was generously given five months to comply with his Agreement and he was clearly advised that failure to do so would result in non-renewal of his contract. Elzein's own failure to abide by his agreement constitutes a legitimate non-discriminatory reason for AGH's non-renewal of his Agreement. Accordingly, summary judgment for AGH is warranted as a matter of law.

**B.     Elzein Was Not Subjected to Any Unlawful Harassment Based on His Race, National Origin, or Religion As a Matter of Law.**

To prevail on a hostile work environment harassment claim, Elzein must establish that the allegedly offending conduct was: (1) unwelcome; (2) based on his race, national origin or religion; (3) sufficiently severe or pervasive to unreasonably interfere with his work performance by creating a hostile, offensive, or intimidating work environment; and (4) imputable to AGH. See *Oncale v. Sundowner Offshore Serv.,* 523 U.S. 75, 80 (1998); *Harris v. Forklift Sys., Inc.,* 510 U.S. 17 (1993);

*Hafford v. Seidner,* 183 F.3d 506, 512 (6th Cir. 1999).

As the United States Supreme Court has emphasized, "conduct must be extreme to amount to a change in the terms and conditions of employment." *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998). Therefore, only conduct that is severe or pervasive is actionable. *Id.* Whether conduct is severe or pervasive depends upon the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23 (1993). To make conduct imputable to AGH, Elzein must establish that AGH had notice of the alleged harassment and failed to take prompt and appropriate remedial action. *Ladd v. Grand Trunk W. R.R.,* 552 F.3d 495, 500 (6th Cir. 2009). Under this standard, Elzein's Title VII claims fail as a matter of law and warrant summary judgment in AGH's favor.

1. Elzein failed to exhaust his administrative remedies as to his national origin claim.

The plaintiff must file a timely charge with the EEOC within 300 days of the events alleged in the charge as a prerequisite to bringing a legal action under Title VII. 42 U.S.C. §20000e-5(f)(1); *Alexander v Gardner-Denver Co*, 415 U.S. 36, 47 (1974). Here, while Elzein alleges a claim for national origin discrimination under Title VII, his EEOC charge does not include national origin as a basis of discrimination. **R.E. No. 25-13.** Further, Elzein's statement of particulars on the

32

EEOC Charge also fails to mention national origin as a basis for any alleged adverse action. He alleges discrimination based on his Sudanese heritage for the first time in his Complaint. Because Elzein failed to exhaust his administrative remedies, summary judgment for the AGH must be granted as to his national origin claim as a matter of law.

2. The District Court Correctly Found That Elzein's unsubstantiated allegations of isolated comments do not rise to the level of harassment.

In his Complaint, Elzein identifies no more than five amorphous utterances (some simply addressing his lack of clinical skills and not his race or national origin) in a six-month period by individuals that he cannot identify as the basis for his allegation of a hostile work environment. These isolated comments were infrequent at best and are simply not sufficiently severe or pervasive as a matter of law to establish an actionable hostile environment claim. *Dabish v. Chrysler Motors Corp.*, 902 F.2d 32; 1990 U.S. App. LEXIS 7680, \*2 (6th Cir. May 9, 1990).  Elzein does not allege, nor were there any, threatening or humiliating incidents. Accordingly, the alleged unwelcome conduct was not severe or pervasive and summary judgment for AGH is warranted as a matter of law.

3. The District Court Correctly Held That Elzein's Allegation of a Single Comment About Religion Cannot Establish Harassment.

Elzein's claim of harassment based on religion also fails as a matter of law because it is based on a single purported statement made on what would become his

33

final day of work.  Setting aside for a moment the fact that every witness he identified denies any such statement was made, and the fact that the statement was made on a day Elzein's own psychiatrist testified he was paranoid and delusional, the single statement alone is still insufficient as a matter of law and, at most, is nothing more than a mere offensive utterance. Elzein does not allege that the single comment was accompanied by any threatening conduct. Moreover, the witnesses he identified did not substantiate his allegation. Accordingly, summary judgment for AGH is warranted as to this claim.

4.  Elzein's Harassment Claim Fails Since AGH Promptly Investigated The Single Concern Elzein Made Known on November 30, 2020

Despite being well aware of the myriad of complaint mechanisms available to him, and of his affirmative obligation under AGH's EEO Policy to report any purported harassment, Elzein did not make use of any of these mechanism until November 30, 2020 (well after November 11, 2020, his last date worked).  In fact, November 30, 2020 was the date on which – for the first time -- Elzein notified AGH about a single comment which he believed to be harassing. **R.E. No. 25-10**. AGH immediately undertook an investigation and found Elzein's allegation to be unsubstantiated. Elzein provided AGH with no notice of any other purported instances of harassment on the basis of any protected classification.  To the extent Elzein failed to make AGH aware of the complaints he now seeks to raise for the first time in his Complaint, his failure to utilize the complaint mechanisms available

34

to him is fatal to the viability of his claims. Accordingly, summary judgement for AGH is warranted as to Elzein's claims of harassment, regardless of basis.

**C.    Elzein's Claim of Retaliation Fails As a Matter of Law**

To establish a *prima facie* claim of retaliation, Elzein must show: (1) he was engaged in protected activity; (2) the decisionmaker(s) knew of the protected activity; (3) they took a materially adverse action against him; and (4) a causal connection exists between the protected activity and adverse action. *Donald v. Sybra,* 667 F.3d 757, 761 (6th Cir. 2012). In other words, Elzein must prove the "protected activity was the but-for cause of the adverse employment action." *Kenney v. Aspen Techs., Inc.,* 965 F.3d 443(2020).

If a plaintiff establishes a *prima facie case*, the burden of production of shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. *Tuttle v. Metropolitan Gov't of Nashville*, 474 F.3d 307, 320 (6th Cir. 2007). The plaintiff then must demonstrate that the proffered reason was not the true reason for the employment decision. *Id.* A plaintiff establishes pretext by showing that the reason offered by the defendant: 1) has no basis in fact; 2) did not actually motivate the decision; or 3) was insufficient to warrant the decision. *Manzer v. Diamond Shamrock Chems*. Co., 29 F.3d 1078, 1084 (6th Cir. 1994).

Elzein claims that, on November 11, 2020, he advised his senior resident and his Program Director that another Resident told him to "go back to where you came

from" while Elzein was praying. Elzein then relies solely on his own unsubstantiated assumptions to argue that, because he made this concern known, his Program Director conspired to discredit him and end his Residency. This argument is at best nonsensical and, in any event, wholly devoid of any legal merit.

To the extent Elzein argues that his visit to the ER was retaliatory, the evidence is clear that Elzein did not raise his complaint until November 30, 2020 (three weeks after his last day of work as a Resident). Moreover, the record is replete with evidence of Elzein's odd behavior on November 11, 2020 and Elzein's own psychiatrist testified that Elzein was suffering from paranoid delusions at the time. By contrast there is no record evidence that Dr. Pawalczyk had anything but Elzein's best interests at heart when she suggested he get checked out by the ER based on his own description of his symptoms.

To the extent Elzein seeks to argue that his Resident Training Agreement was not renewed because of some unsubstantiated and non-existent retaliatory animus, this ignores the significant effort over many months by Dr. Pawalczyk to remind and cajole Elzein to submit the medical clearance required under the terms of his Resident Training Agreement so that Elzein could simply return to work as a Resident.  In short, the record is wholly devoid of any evidence of a causal connection between the alleged adverse actions and any alleged protected activity by Elzein, much less the "but for" causation evidence necessary under the statute.

As such, summary judgment in favor of AGC is warranted as a matter of law as to Elzein's claim of retaliation.

Moreover, even if Elzein could somehow establish a *prima facie* case of retaliation (which he cannot), the record reveals that Elzein cannot demonstrate that the legitimate non-discriminatory reason for not renewing his Resident Training Agreement (which is set forth in greater detail above) was mere pretext.

## D.      Elzein's False Imprisonment Claim Fails As A Matter of Law

Elzein claims AGH falsely imprisoned him by forcing him to seek medical attention at the Emergency Room on November 11, 2020. While the District Court ultimately declined to exercise supplemental jurisdiction over this state law claim after dismissal of Elzein's federal law claims, Elzein's claim of false imprisonment is wholly unsustainable as a matter of law.  The tort of false imprisonment requires the intentional unlawful restraint of an individual's personal liberty or freedom of movement. *Stowers v. Wolodzko, 386 Mich 119, 134 (1971)*; *Clarke v K-Mart Corp.*, 197 Mich. App. 541, 546 (1992). The restraint necessary to create liability for false imprisonment may be imposed either by actual physical force or by an express or implied threat of force. *Id.* The elements of false imprisonment are: (1) an act committed with the intention of confining another; (2) the act directly or indirectly results in such confinement; and (3) the person confined is conscious of his confinement.'" *Moore v. Detroit*, 252 Mich. App. 384, 387 (2002), quoting *Adams*

*v. Nat'l Bank of Detroit*, 444 Mich. 329, 341 (1993).

"The essence of a claim of false imprisonment is that the imprisonment is false, i.e., without right or authority to do so." *Hess v Wolverine Lake*, 32 Mich. App. 601, 604 (1971); *Moore v. Detroit* at 388; *Miller v. CVS Pharm Inc.* 779 F. Supp. 2d 686 (E.D. Mich 2011) (An employer does not "unlawfully" confine its employee by compelling the employee to answer questions about a suspected violation of company rules.). There is no false imprisonment if the plaintiff voluntarily agrees to stay with defendant. *See Bonkowski v Arlan's Department Store*, 383 Mich 90, 96-97 (1970) (plaintiff returned to the store and agreed to an inspection of her purse upon a security guard's request).

In *Prieur v. Acuity*, the court held there was no false imprisonment when the employer asked the plaintiff employee to attend an independent medical examination by a psychologist or risk losing benefits. *Prieur v. Acuity*, 143 F. Supp. 3d 670, 674 (E.D. Mich 2015). The employer did not use express or implied force or confine the employee. Rather, the court determined the employee voluntarily agreed, which undermines any claim he was "confined" as required by false imprisonment.

Here, the evidence reveals that Elzein announced he was feeling not like himself, was feverish, had not eaten and had not been sleeping. Coupled with his odd behavior from the day (including the imaginary bomb threat report, his belief that his colleagues were trying to poison him with an invisible talisman), and his

own psychiatrist's testimony that Elzein was suffering from paranoid delusions, Dr. Pawlaczyk was correct in offering Elzein the opportunity to go to the Emergency Room and encouraging Elzein to avail himself of the opportunity.  While Elzein claims he first did not want to go, he ultimately admits he <u>chose</u> to go to the ER. Elzein agreed to go to the ER and stay in the ER. The ER is a public place, the doors are not locked, Elzein was not restrained, and nothing prevented him from walking out at any time. Based on these facts, Elzein cannot prove the requisite elements of a false imprisonment claim and summary judgment is warranted as a matter of law.

## X.    CONCLUSION

There is no record evidence to support any contention that Elzein made AGH aware of any disability. To the contrary, Elzein has categorically denied suffering from any disability. As to his claim of discrimination on the basis of a perceived disability, Elzein has failed to establish a *prima facie* case because there is no record evidence that AGH perceived him to have a disability, he did not establish he was qualified for the essential functions of the job and there was no adverse employment action. Elzein's claims of harassment fail as a matter of law as the purported act complained of occurred on a single day, a day on which Elzein was diagnosed to be suffering from paranoid delusions so severe that he required in-patient care at a psychiatric hospital. Elzein's national origin claims fail because he failed to exhaust his administrative remedies by excluding any such allegations from his EEOC

Charge. Elzein's Retaliation claim fails because there is no record evidence to support that AGH held retaliatory animus towards Elzein, much less that such animus was the but-for cause of any adverse employment action. Finally, Elzein's state law claim for false imprisonment fails as a matter of law because Elzein admits he ultimately elected to go to the ER and stay in the ER (a public place with no locked doors and where he was never restrained or prevented from leaving in any way). Accordingly, Ascension Genesys Hospital seeks an Order from this Court denying this Appeal and affirming the District Court's decision granting Summary Judgment as to all claims raised by Elzein in his Complaint.

Respectfully submitted,

JACKSON LEWIS P.C.

/s/ Michelle J. LeBeau
Maurice G. Jenkins (P33083)
Michelle J. LeBeau (P51440)
2000 Town Center, Suite 1650
Southfield, MI 48075
(248) 936-1900
Maurice.Jenkins@jacksonlewis.com
Michelle.LeBeau@jacksonlewis.com
*Attorneys for Ascension Genesys Hospital*

Dated: May 16, 2025

## <u>CERTIFICATE OF COMPLIANCE</u>

This Brief complies with the type-volume limitation of FRAP Rule 28.1(e)(2)(B) and 6 Cir. R. 32(a), because it contains 9,198 words, excluding the parts of the document exempted by FRAP 32(f).

This Brief complies with the typeface requirements of FRAP 32(a)(5)(A) and the type-style requirements of FRAP 32(a)(6) because it is in 14-point Times New Roman proportional font.

/s/ Michelle J. LeBeau
Michelle J. LeBeau (P51440)

Dated:  May 16, 2025

## <u>CERTIFICATE OF SERVICE</u>

I certify that on May 16, 2025, I filed the foregoing brief with the Clerk of this Court using the CM/ECF system, which will send electronic notice of such filing to counsel of record for all parties.

/s/ Michelle J. LeBeau
Michelle J. LeBeau (P51440)

Dated:  May 16, 2025

## ADDENDUM

| Case No. | RE No. | PageID # | Document Description |
|---|---|---|---|
| 22-12352 | 1 | 1-14 | Complaint and Jury Demand |
| 22-12352 | 25 | 146-305 | Defendant's Motion for Summary Judgment |
| 22-12352 | 29 | 476-488 | Defendant's Reply Brief in Support of its Motion for Summary Judgment |
| 22-12352 | 31 | 604-625 | Opinion and Order Granting Defendant's Motion for Summary Judgment (ECF No. 25) |
| 22-12352 | 32 | 626 | Judgment |
| 22-12352 | 33 | 627 | Notice of Appeal by Plaintiff Ahmed Elzein |

4933-8865-7988, v. 1

43